# Exhibit A

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   JAN DOMANUS, et al.,         )
                                  ) Docket No. 08 C 4922
 4              Plaintiffs,       )
                                  ) Chicago, Illinois
 5        v                       ) October 28, 2011
                                  ) 11:00 a.m.
 6                                )
     DEREK LEWICKI, et al.,       )
 7                                )
                Defendants        )
 8

 9              TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE NAN NOLAN
10

11   PRESENT:

12

     For the Plaintiff:      ROBERT S. MICHAELS
13                           Robinson, Curley & Clayton, P.C.
                             300 South Wacker Drive
14                           Suite 1700
                             Chicago, Illinois 60606
15
     For Certain Defendants: LUCAS M. FUKSA
16                           Fuksa Khorshid LLC
                             70 West Erie
17                           3rd floor
                             Chicago, Illinois 60654
18
     For KBP Defendants:     MARTIN E. JASZCZUK
19                           Locke Lord LLP
                             111 South Wacker Drive
20                           Chicago, Illinois 60606

21   (TRANSCRIBED FROM DIGITAL RECORDING.
      PLEASE PROVIDE CORRECT SPEAKER IDENTIFICATION)
22
     Court Reporter:         Lois A. LaCorte
23                           219 South Dearborn  Room 1918
                             Chicago, Illinois 60604
24                           (312) 435-5558

25
```

1       THE CLERK:  08 C 4922, Domanus v Lewicki, et al.

2       THE COURT:  Okay, good morning.  For Jan Domanus?

3       MR. MICHAELS:  Robert Michaels on behalf of plaintiffs.

4       THE COURT:  All right, thanks, Mr. Michaels.

5       MR. FUKSA:  Lucas Fuksa on behalf of the individual

6  defendants.

7       THE COURT:  Okay.  And?

8       MR. JASZCZUK:  Martin Jaszczuk on behalf of the KBP

9  entity, your Honor.

10      THE COURT:  Okay, good morning, sir.  Is it J-a-c -- how

11  do you spell it?

12      MR. JASZCZUK:  I have been asked that a lot.

13  J-a-s-z-c-z-u-k.

14      THE COURT:  Okay.  I'll never get it right.  But I

15  intend to.

16      MR. JASZCZUK:  I barely get it right.

17      MR. MICHAELS:  You should hear the correct pronunciation.

18      THE COURT:  Okay.  All right.  So we had a status last

19  week and several things came up.  We laid four things out in

20  our minute order.  So I would like to stick to our agenda from

21  the minute order, and tell me if you have any answers.

22      We also had a motion that we, among the things was a

23  motion to extend the dates.  So a due date for providing

24  defendant's responses to plaintiff's set of interrogatories.

25      MR. MICHAELS:  Judge, I think before we talk about each

1   of the four things --

2        THE COURT:  Okay.

3        MR. MICHAELS:  -- I wanted to give you just a --

4        THE COURT:  Oh, good.

5        MR. MICHAELS:  -- bit of background on what is driving

6   the sense of urgency on our side of this and then we can get

7   into each of the four agenda items that Mr. Fuksa and I did

8   meet and confer about in person as your Honor directed.

9        If we were talking about harm that happened in the past

10  exclusively, delay would be undesirable perhaps, but certainly

11  more tolerable on our end.  But we're talking about what we

12  allege is an ongoing fraud, and while it appears to us that

13  the case is being slowed down over here, in Poland the

14  defendants are taking further actions to dilute my client's

15  ownership in the KBP entities, and in fact, even earlier this

16  morning in Poland, Adam Swiech's wife, who was installed as

17  president of KBP, convened a meeting to bring in an additional

18  shareholder of KBP.

19       I said as sort of a global point to Mr. Fuksa that if the

20  defendants would agree to cease and desist efforts to further

21  dilute our ownership in KBP, we could be much more

22  accommodating about time in this case because we would not see

23  ourselves in a race against time.

24       And we -- I said that if they were willing to do that,

25  then we would be much more accommodating on timing here

1    because we have no desire to personally immiserate anyone or

2    demand the impossible or anything like that.  But

3    unfortunately, from what Mr. Fuksa and I discussed this

4    morning, the defendants are not willing to do that.

5         So against that background, you know, the sense of

6    urgency we feel is a great one on all of these issues.  And

7    just so you understand, we're not just trying to step on the

8    accelerator because we're tired or we're bored.  It's just we

9    see our interests as threatened in a dire way by events that

10   continue to go on.

11        THE COURT:  All right.  So you know, I think judges learn

12   cases halfway through.  I don't think they ever get it by

13   reading a complaint, you know, because it's all too much at

14   first.  Tell me in a hundred words or less how this is a new

15   harm or an ongoing harm.

16        MR. MICHAELS:  Certainly.

17        THE COURT:   Your folks put money, gave money to them and

18   invested it, yes?

19        MR. MICHAELS:  Yes.  And over time, the defendants

20   diluted our ownership in KBP by investing as capital

21   contributions money that we allege they had misappropriated

22   from the KBP entities.  So that diluted our proportional

23   ownership of KBP, and what is happening now in Poland is that

24   Adam Swiech, who is because of this dilution now the majority

25   shareholder of KBP taking further steps to reduce our

1    proportional ownership and eventually trigger the squeeze-out

2    provisions under Polish law that would, if he gets a portion

3    of ownership over I think it's 75 percent, he can squeeze out

4    the minority shareholders on very unfavorable terms.

5        THE COURT:   So did your folks get to vote this morning

6    on this?

7        MR. MICHAELS:   They did get to vote, but it's useless

8    because Adam has the majority of shares, Adam Swiech, and he

9    votes his majority of shares and he can prevail on anything he

10   wants to prevail on.

11       MR. FUKSA:    Judge, if I may, that explanation is quite

12   problematic on a variety of fronts.  First of all, it shows

13   really what the urgency is about, and if it's not based on

14   actual harm, then there is no urgency at all, which is the way

15   I understand their position.

16       And there is no harm because this is the direct

17   day-to-day operations of the company that are ongoing.  This

18   isn't some, you know, little mom and pop shop.  Their clients

19   are people such as UBS, the tenants, Shell Oil, okay?  And

20   they have been continuing to make capital calls because there

21   are buildings that aren't developed.  If that's the allegation

22   regarding the fraud, then, you know, I'll be happy to file a

23   motion for summary judgment tomorrow because there is

24   absolutely nothing that I have heard yet, and I don't think

25   your Honor has heard, to indicate that this is an ongoing

1    fraud.  It wasn't even alleged so in the complaint.

2        There were certain transactions or maybe actions that

3    were alleged in that manner, but it wasn't alleged that this

4    is an ongoing harm and that it continues to be a harm, and for

5    the shareholders to have a meeting and maybe consider taking

6    in a new shareholder because they need money, which has always

7    been the problem, which my client Adam has put in millions of

8    his own money and given loans to the company because the other

9    shareholders weren't able to, he should be punished for that?

10       I mean, it's ludicrous, Judge, and it goes exactly to

11   show right now why the plaintiffs are making this such an

12   urgent matter regarding discovery, because it's an ulterior

13   way for them to stop this company from operating in its

14   day-to-day functions.

15       THE COURT:  Well, that would hurt -- I mean, that would

16   hurt the plaintiffs if the company couldn't operate.  I mean,

17   that doesn't --

18       MR. FUKSA:  Well, that's --

19       THE COURT:  I mean, to me --

20       MR. FUKSA:  -- circular reasoning.  If they can't raise

21   money in order to further promote the interests of this

22   business in order to build the additional buildings --

23       THE COURT:  Well, that will be -- okay, I just -- this

24   wasn't an argument on summary judgment.  I wanted to be

25   refreshed.  I just wanted to be refreshed on this is a harm,

1   this is a harm.  I wanted to know if it was a money harm, a

2   broken heart harm.  There is all kinds of harms I hear, okay?

3           MR. FUKSA:   I have had the broken heart harm, Judge.

4           THE COURT:   So I mean, I'm trying to get the category

5   of --

6           MR. FUKSA:   Well, Judge, we can't agree on that.  You

7   know, if they want to make it urgent because of these --

8   opposing counsel had asked me, if you agree to stop these

9   capital calls and stop, you know, maybe soliciting additional

10  shareholders, we'll agree to pull back on the urgency of the

11  discovery.  I said we can't agree to that.  So we're past

12  that.  I mean, if we could get to the first item on the agenda

13  then, you know --

14          MR. MICHAELS:   And Judge, just to -- I think Mr. Fuksa is

15  right about that issue.  If they won't agree -- I would say

16  this.  The complaint expressly repeatedly alleges an ongoing

17  harm.

18          THE COURT:   Right.

19          MR. MICHAELS:   And if a new shareholder they were

20  bringing in was some legitimate third-party, we would have no

21  problem with that.  The shareholder they're bringing in is an

22  entity that was formerly owned by one of the defendants that

23  was used as part of the fraud.  So that's the issue we're

24  having.  But if they can't agree to it, that's fine.  And he

25  doesn't have to agree to it.

1      THE COURT:   No, and that was part of the meet and

2  confer.

3      MR. MICHAELS:  I was just trying to be creative to try

4  to --

5      THE COURT:   Right.

6      MR. MICHAELS:  -- find a way to compromise, and if that

7  doesn't work, then that's fine.

8      THE COURT:   Okay.  So, well, let's see what we have got.

9  So actually, it shouldn't be No. 1 a due date for providing

10  two, okay.  Let's do the timetable for producing the

11  responsive documents from Richard Swiech's hard drive.

12      MR. FUKSA:   Judge, I think with respect to No. 1, that

13  was a specific set of interrogatories regarding transactions,

14  so I could address that to the court.

15      THE COURT:   And that's the one you wanted -- that was a

16  written motion --

17      MR. FUKSA:   No, that was a Part 2 agenda item, more

18  related to the discs.

19      THE COURT:   Oh, okay.

20      MR. FUKSA:   If I may judge, with respect to No. 1,

21  providing a due date for responses to plaintiff's second set

22  of interrogatories, I met with Mr. Michaels and what these

23  responses are is Mr. Michaels would like a response to -- and

24  I can bring this to your Honor -- a set of transactions, pages

25  of transactions dating from 1997 that simply show the

9

1    recipient, payor and the amount.

2        MR. MICHAELS:  And the date.

3        MR. FUKSA:  And the date, okay.  I have asked all three

4    of my clients about this and they told me I'm crazy, okay,

5    there is nothing else to substantiate or help us in directing

6    us as to what these transactions are for.  The company makes

7    thousands of transactions on, you know, an ongoing basis, and

8    to list these transactions and say --

9        THE COURT:  Let me see this.  Let me see this.

10       MR. FUKSA:  And, Judge, also, even previous counsel

11   said, and this is my exact same argument, previous counsel

12   said it might help to answer your request if the transactions

13   listed in Exhibit A were separated based on which defendant

14   you believe has information and if we had any documents upon

15   which you are relying to complete (UI) if plaintiffs have

16   documents from which they are extracting information

17   (inaudible) but Exhibit A, we request that plaintiffs provide

18   and identify those documents for us.  That's all I'm asking

19   because we -- and there is pages of these.

20       MR. MICHAELS:  Your Honor, when you're done looking at

21   that, I would like to respond to what Mr. Fuksa just said.

22       (Pause)

23       MR. FUKSA:  They simply do not know or do not remember,

24   Judge, without additional information.  I'm not trying --

25   they're not trying to avoid answering these.

1      THE COURT:  So do you have this broken down -- so first

2  of all, where did you get these documents that you made your

3  list from?  Did you get them from them is what I'm asking, and

4  do you have further identification as to each of these

5  transactions?

6      MR. MICHAELS:  Your Honor, if I could respond to that.

7      THE COURT:  Sure.

8      MR. MICHAELS:  That list was largely derived from a

9  forensic report that was prepared by the Polish prosecutor's

10 office who has, you know, has charged the defendants with

11 crimes related to these same transactions.  We provided a copy

12 of the forensic report to former counsel, and presumably Mr.

13 Fuksa has those now.

14     We also provided and I think a set of the responses are

15 in the packet that you have there, some extraordinarily

16 detailed interrogatory responses after Ms. Shores wrote the

17 letter that Mr. Fuksa has cited.  The interrogatory responses

18 --

19     THE COURT:  No, the letter Mr. Fuksa is citing is your

20 letter.  Actually, this is a Robinson Curley letter --

21     MR. MICHAELS:  Oh, okay.

22     THE COURT:  -- explaining what you want.

23     MR. MICHAELS:  Okay.

24     THE COURT:  And that you have -- this explains No. 2 and

25 3 and I guess Exhibit A is 2 and 3.

1    MR. MICHAELS:  Right.

2    THE COURT:  And then I don't -- so all I have -- all I

3    can see here -- so this, now this has a KBP.  This has a date

4    on when it occurred --

5    MR. MICHAELS:  Your Honor --

6    THE COURT:  -- the recipient of, is it the recipient of

7    the transfer or the recipient -- I don't know what recipient

8    means.  The payor was this so it looks like it went to, most

9    of them to KBP and then it's the amount and it says PLN.

10   MR. MICHAELS:  Right.  What the chart contains, your

11   Honor, is a list of, for each of the transactions that we

12   allege were fraudulent transactions paid to an insider or a

13   defendant himself, we list the date of the transaction, the

14   amount of the transaction, the KBP entity that was caused to

15   make the transfer, and the recipient of the transfer.

16   All of these recipients are either defendants or entities

17   they themselves control.  We're not asking them to explain the

18   payments to third parties.  So what we did, I broke down that

19   list of each of the transfers that we wanted their explanation

20   of.  These are transfers that they were on collectively both

21   sides of.  So -- and what we did to provide more background on

22   those transfers is we produced to them A, the prosecutor's

23   forensic report from which we got this material.

24   THE COURT:  Right.

25   MR. MICHAELS:  And then B, about 60-page detailed

1   interrogatory responses, my responses to the interrogatory

2   responses that Gordon & Karr sent us.  Those interrogatory

3   responses identify which defendant we believe is affiliated

4   with each of the insider entities that were the recipients.

5   Some of the recipients of those were just Adam Swiech, so if

6   Adam received it and then the other, you know, there were

7   other entities there, for example, connection SP-ZO, we

8   explain is their interrogatory responses, that's an entity

9   that was owned and controlled by Derek Lewicki.  So we gave

10  them the prosecutor's report from which that came on

11  interrogatory responses that explained why based on what we

12  know now so far, we believe those transactions were

13  fraudulent.  And they were all involved in those transactions.

14      And we also identify there are numerous documents that

15  they ought to have that -- I mean, many of those were pursuant

16  to contracts and where we had the contracts we produced them.

17      MR. FUKSA:  That's all we need.  That's all we need,

18  Judge.  If he could identify for each transaction this is from

19  this contract, now tell me, you know, whether it was

20  fraudulent or not or what it was for, I would be happy to do

21  that.  I would be, you know -- instead this is a fishing

22  expedition --

23      THE COURT:  This is not.  You're not allowed to say

24  that.  You are not allowed to say that.  You're allowed to say

25  other things, okay?  You're not allowed.  The reason you are

1    getting the boots put to you, and I'm not going to put the

2    boots to you on time, is these people, there has been -- I

3    mean, you know, would it take him a long time to do that?

4    Yes.

5         And I'm going to ask, I'm going to ask Mr. Michaels to go

6    back, but if he has already -- if you have a prosecutor's

7    memo, okay, that has all this information in it, okay, what is

8    going to happen is people come in here and frankly go on and

9    on and on, they don't want to answer interrogatories.  They

10   say to me wait until the dep.  How the heck is anybody ever

11   going to get through a dep -- this is going to help you as

12   much as it's going to help him.

13        MR. FUKSA:   I 100 percent agree, Judge.

14        THE COURT:   I'm not going to send him back to the

15   drawing board on everyone of these things if it's in the

16   prosecutor's report --

17        MR. FUKSA:   I haven't seen that, Judge, so if it is,

18   that's fine.  The source of the information I learned today

19   with respect to the prosecutor's report, so I could send that

20   to my clients with that list and say "This is where you should

21   find that information," and if they do, then fine.  I'm not

22   trying to be evasive at all.  Ms. Shores said the exact same

23   thing.

24        THE COURT:   You're not.  You're not.  It isn't, you

25   know, but we are our brother's or sister's keepers in a way.

1    I'm not saying you are, okay?  So does the prosecutor report,

2    because I haven't seen the prosecutor report, is the date of

3    transaction in the prosecutor report?

4         MR. MICHAELS:  It's all in there, Judge, because we

5    didn't have -- because we were not the -- we were passive

6    investors in KBP, while Adam was running the day-to-day --

7         THE COURT:   You did not get -- and you did not get every

8    time a transfer was made.

9         MR. MICHAELS:  No, not at all.

10        THE COURT:   All right, all right, all right, so this is

11   all from -- and I'm assuming that Adam either pursuant to a

12   subpoena or grand jury or whatever they use the Poland must

13   have turned over documents to the prosecutor or did they get

14   them through the -- are these bank -- is this from a bank or

15   is it from like a Morgan Stanley Dean Witter?  What is this

16   from?

17        MR. MICHAELS:  My understanding is that it is from --

18   that that was synthesized by the prosecutor from KBP's bank

19   records, KBP's general ledger, or the KBP entities' general

20   ledger, KBP bank records, KBP files that had, for instance,

21   contracts and invoices, and from, to the extent they were able

22   to get them, Adam Swiech's bank records and the bank records

23   of the recipient entities that are identified in there and

24   between -- in our view between the prosecutor's report and our

25   progress responses which Mr. Fuksa told me before we met today

1  he hasn't even read yet, which I gave to him the first time I

2  went to his office and said --

3        THE COURT:   Which lays out your theory.

4        MR. MICHAELS:  Yes.

5        THE COURT:   Lays out your theory.

6        MR. MICHAELS:  Everything should be there.

7        THE COURT:   All right.

8        MR. FUKSA:   Judge, I'll take another stab at it.  If in

9  fact the information is in the prosecutor's report or in these

10  interrogatory responses, I'm happy to do that.  We don't have

11  to dwell on this.

12        I'm going to do my best -- you know, if that information

13  is in there, to get answers to these and I'll scan everything

14  to my clients, send it out, and say this is the source of the

15  information, you know, explain what these transactions are

16  for.  No problem doing that, Judge.  So now is just again a

17  question of time.  Maybe that will be -- the question of

18  time --

19        THE COURT:   We're going to do, we're going to do an

20  interim step on this.  We're doing an interim step because we

21  are going to keep you guys on such a short leash and you're

22  going to come back and you're going to tell me what you have

23  done, and you need to look -- so is there anything else, Mr.

24  Michaels, other than your interrogatory answers and -- well,

25  first, let me back up.

1      Is this -- plaintiff's second set of interrogatories, is

2  there anything else that is not answered in plaintiff's second

3  set of interrogatories or is plaintiff's second set completely

4  discharged?

5      MR. MICHAELS:  It is not discharged.  There are other

6  things that were not responded to, but that we thought were a

7  lower priority.  While I wouldn't -- I would be hesitant to

8  say it's discharged.  What I would be willing to say is that

9  if he answers those -- if he answers 2 and 3, which is really

10  all we're talking about here, anything else, we would

11  reformulate into a new, into a third set that we tried to --

12  that it would then be able to reflect or comprehend what we

13  have gotten already.  In other words, we are not going to --

14  we are going to take the rest of the second set of

15  interrogatories off the table, so far as we are without

16  prejudice to reask that stuff in a more targeted way later if

17  necessary.  I mean, believe me, if there is --

18      THE COURT:  How many sets -- so if the first set -- how

19  many interrogatories were questioned in the first set?

20      MR. MICHAELS:  I think there were 6 or 7 -- oh, I have a

21  copy of the first set right here.  And then your order

22  required them to respond to I think three of them.  There

23  were, let's see.

24      THE COURT:  Well, I mean on this, you know, this

25  number --

1        MR. MICHAELS:  Four.

2        THE COURT:   Four.

3        MR. MICHAELS:  In the first set.

4        THE COURT:   And were they as voluminous as this?

5        MR. MICHAELS:  Well, the first set, the only ones that

6    they were ordered to respond to two of them, I think, and they

7    were required to identify any bank accounts.

8        THE COURT:   Okay.

9        MR. MICHAELS:  And provide their bank records, and the

10   other thing they were required to do was identify any entities

11   in which they owned, had ownership interest.

12       THE COURT:   All right.  So so far as -- what we'll do

13   with future interrogatories -- you made your record.  You're

14   without prejudice.  You're without prejudice.

15       I don't know what I'm going to do about it, but Mr.

16   Fuksa, I want him to go back, make sure he has the -- you

17   know, you go back because you got some stuff from the old firm

18   too, so make sure you have got the prosecutor's report.

19       MR. FUKSA:   There is a problem with that, what your

20   Honor just stated, because I realize that the production that

21   we have made to opposing counsel originally is being withheld

22   from me.  I had a telephone conversation on Thursday, I

23   believe -- Wednesday with Mr. Karr --

24       MR. MICHAELS:  And, Judge, I would just say this.  First

25   of all, I will go and get the Bates number of the prosecutor's

1    report and e-mail it to Mr. Fuksa by Monday at the latest.  I

2    will also check with Mr. Kozlowski, who speaks Polish, and can

3    tell me if there are other things in our production --

4         THE COURT:   Good.

5         MR. MICHAELS:  -- that they want to consult and I will

6    give him the Bates numbers of those documents.

7         THE COURT:   Good, that would be very helpful.  And then

8    his -- but Mr. Michaels', I guess, answer in his interrogatory

9    answer, is it like the flip side of this chart?  Did they --

10   did Karr give you an interrogatory?

11        MR. MICHAELS:  What they did is they walked through the

12   complaint.  So that chart is a more -- our complaint lays out

13   many but not all of the transactions that are in the chart and

14   what Karr's interrogatories did is they basically went through

15   paragraph by paragraph and said why, what facts support your

16   allegation that this transaction was fraudulent, et cetera.

17        And then -- so our interrogatory responses were, which

18   Karr never objected to, were incredibly detailed about why we

19   thought the various transactions were fraudulent.

20        Now, we don't and are not able to -- I mean, there is

21   some of this stuff that we just don't know.  We have

22   "investigation continues."

23        The basis for our belief that, for instance, Company X

24   didn't perform these services is that, no, the principal

25   doesn't speak English and the services required English to be

1   spoken, someone else did the services and we identify who they

2   are, et cetera.

3       But some of them, we know more on some than on others.

4   So it would seem to me between the prosecutor's report, their

5   own knowledge -- I mean, they're the ones who conducted these

6   transactions with themselves and our interrogatory responses

7   ought to be, whatever their position is they ought to be able

8   to provide it.

9       MR. FUKSA:   Judge, one other thing.  With respect to

10  answering those, when I talked to my clients, they even said

11  that they don't know if these transactions that are listed had

12  actually been consummated or whether it was just potential

13  transaction.  So that's how little they're able to contribute

14  to answering these at this point.  So that's also, the other

15  issue is whether there were actual transactions, and I don't

16  know if you know that now.

17      MR. MICHAELS:  They are actual transactions.

18      THE COURT:  Well, then, that would actually be pretty

19  interesting if they say they weren't.

20      MR. MICHAELS:  Right.

21      THE COURT:  I mean, that could be an answer too.  I

22  mean, if that's their position, then that's fine.

23      MR. FUKSA:   Right.

24      THE COURT:  I mean, that can be their position.

25      MR. MICHAELS:  Absolutely. But to clear up to the

1    extent -- to clear this up for you, we did not put on that

2    chart any transactions that we did not believe based on the

3    evidence we have seen did not in fact occur.  Those were not

4    transactions that were payments that were scheduled, those

5    were payments that we maintain were actually made.

6         THE COURT:  And your question to each of these parties

7    is the exact nature of the goods or services or consideration

8    provided.  So it is -- because all we have on this chart is

9    the recipient, the payor, and the amount, the identity of all

10   documents regarding the transfer, the name, title, and last

11   known address of all persons associated with the person or

12   entity who provided the goods, associated with the KBP entity

13   who interacted with the person or entity.  Okay.

14        MR. MICHAELS:  So I mean, we are just seeking their

15   explanation for the transactions.

16        THE COURT:  Well, it's not that I'm not -- it's not that

17   I am not sympathetic to how much work it is, but truthfully,

18   sir, how could you defend the case without knowing this?

19        MR. FUKSA:  I agree.

20        THE COURT:  I'm sorry.  I mean truthfully, if it takes

21   them working around the clock between how are they going to

22   defend the criminal case without knowing it and how are they

23   going to defend this civil case because, you know, your client

24   or your client's rep have always thought these guys were out

25   on a fishing expedition and how are you going to show it's a

1   fishing expedition unless you know every one of these

2   transactions?

3        MR. FUKSA:   I agree $100 percent, Judge, but my only

4   reason for saying fishing expedition is what I can't

5   understand is if they allege that these are fraudulent

6   transactions, why not at least show some basis for why these

7   were -- like a contract, or something, so I could then say,

8   okay, you know what?  We are going to identify these

9   transactions that are of such great concern, not ones that

10  were for maybe paying a utility bill.

11       MR. MICHAELS:  There is no utility bills on there.

12       THE COURT:   There is nothing.  I mean, the amount in --

13  what's the PLN?

14       MR. MICHAELS:  It's about three times.  We only included

15  ones over 10,000 Zloty.

16       MR. FUKSA:   So if you divide that amount by 3 or 4, then

17  you will get dollars.

18       MR. MICHAELS:  And most of them are substantial.  You

19  know, other than -- this has been outstanding since August.

20       THE COURT:   Right.

21       MR. MICHAELS:  I mean, we have -- you know, they are

22  taking this approach where they're sprinting over in Poland to

23  try to further dilute our interests, but they want to get to

24  call to get this stuff down here, and you know, it's neither

25  fair nor reasonable to proceed that way.

1    THE COURT:   So I'm going to give you, in fairness to you

2  particularly, I am going to -- you're going to come back in

3  about a week -- hang on, I don't know yet what date.  But

4  you're going to come back and Mr. Fuksa is going to tell me

5  after you read prosecutor's memo, you see where all this stuff

6  is, your paralegal sits down with the prosecutor's memo and

7  fills in these blanks here, okay, because that's what you're

8  asking him to do.

9      And you're going to take the answers to their

10  interrogatories, make a nice chart, all of that is going to be

11  there and then we're going to at least, by the time you come

12  back, we're going to have some answers from your fellows

13  because I'm not going to give you four months without seeing

14  if their answers are complete.

15    MR. FUKSA:   Right.

16    THE COURT:   I mean, we want to make sure we are going to

17  keep this on track so we know that at least if we're having to

18  put this off a little bit that they are in fact doing it.

19    MR. FUKSA:   Right.  That's fine, Judge.

20    THE COURT:   So we'll pick a date by the 10th.  So the

21  second thing is a timetable for producing the responsive

22  documents from Swiech's hard drive.

23    MR. FUKSA:   Yes.  So, Judge, that's another thing we met

24  about.  I had met with my clients, and this is -- this is what

25  they tell me with respect to the volume.  It seems -- I don't

1    want to exaggerate, but what they say is it's probably a

2    couple hundred thousand pages.  One of them said 500,000.  I

3    don't want to, you know, say that that's the amount.  But this

4    is just to give some idea of how many pages there are.  And

5    what they are doing now, they're in the process and in fact,

6    my client said he could probably have the first two discs for

7    me by Monday.  They're in the process of --

8          THE COURT:   Now, wait, hold on.

9          (Pause)

10         MR. FUKSA:   21 discs.  That's the hard drive

11   information, is the 21 discs.

12         (Pause)

13         MR. FUKSA:   Judge, what your Honor said is to have a

14   timetable for producing those.  Those were never looked at by

15   anyone yet.

16         MR. MICHAELS:  Well, we don't know what Karr did.  Gordon

17   & Karr were ordered in July to -- or in June to review those

18   and produce them by the end of August.  Apparently, they did

19   nothing and they didn't even -- I mean, these documents I

20   understand, these files are in like native formats.  In other

21   words, they were not -- so it's just discs with like Excel or

22   Word Perfect documents or whatever and they weren't -- Gordon

23   & Karr, defendants never caused even the most basic step to

24   happen to produce these, which is send them to a vendor, have

25   them turned into PDFs and get them Bates labeled, which is --

1    the -- that still hasn't even been done.  It first came up in

2    June.

3        MR. FUKSA:   So, Judge, this is in fact what my clients

4    are doing and it's not that simple because there is privileged

5    notes on some of the documents.

6        MR. MICHAELS:   There are lawyers' notes on there?

7        MR. FUKSA:   There is comments, comment bubbles that have

8    nothing to do with the actual original documents.  So in any

9    event, they're going through and they're putting them on a

10   PDF, Bates labeling all of them so that it makes it so much

11   easier because the problem with some of these, there will be

12   an e-mail and then that e-mail will have two or three

13   attachments and one could be in Word and one could be in

14   Excel, and it has to all be PDF'd, Bates labeled, and then

15   that's the manner in which we would turn it over.

16       THE COURT:   When you say your clients are doing this,

17   you're not doing this or your vendor is not doing this?

18       MR. FUKSA:   They didn't want to expend the costs on

19   doing it.

20       THE COURT:   So who is going to certify this then?  Who

21   is going to do the privilege log if you're going to withhold

22   anything?  Who is going to do the inventory?

23       MR. FUKSA:   I'll --

24       THE COURT:   I mean, now, just hang on.  I mean, who is

25   going to --

1    MR. MICHAELS:  Are you going to review them after you get

2 them from your client?

3    MR. FUKSA:   Of course.  Of course.  I don't necessarily

4 think -- there was an occurrence of, for example, a comment

5 bubble, as you sometimes see on a PDF document or you could do

6 it on a Word document when you're -- but the -- I don't think

7 that happened so much, so my concern is not even so much with

8 privilege as it is just getting these documents in a format

9 that are very easy to review, to produce, and, of course, for

10 me to go over.  And I have a time frame, Judge.  So I mean

11 maybe -- I did sit down and talk with my client and you know,

12 we had agreed that we would do two discs per week and possibly

13 more and just do rolling discovery and by that calculation we

14 should have everything done by January 8th with respect to

15 these -- with the discs.  So I think that's reasonable.  They

16 would be, you know, produced on a weekly basis also so then

17 opposing counsel has time to review them.

18    THE COURT:   Right.

19    MR. FUKSA:   Because they will need that.  And they're

20 working on it as we speak even because I know I'm getting

21 these this weekend, at least our first two hopefully.

22    MR. MICHAELS:  But just so I understand, what you're

23 getting then, that just begins your work.

24    MR. FUKSA:    No, no, no, no, no, that would include --

25    MR. MICHAELS:  Then you get the PDFs and you have got to

1    review the PDFs.

2        MR. FUKSA:   That would include my review of it.

3        MR. MICHAELS:  And if you just sent them to a vendor, you

4    could have them all back and start your review in three days.

5        MR. FUKSA:   Judge, I can't force my clients to pay a

6    couple thousand dollars to send them to a vendor.  We had that

7    discussion.  Mr. Michaels knows it too.  And I responded and I

8    said they want to do it themselves.  He has a program that

9    helps facilitate the process.  It's not as if, you know --

10       MR. MICHAELS:  Why didn't he use it over the summer?  I

11   mean, you know, the whole -- all of the circumstances

12   surrounding these documents has been so bizarre from the very

13   beginning, you know.

14       MR. FUKSA:   Judge, I'm giving a clear timetable.  There

15   is two discs per week.  There is, as I said, probably a couple

16   hundred thousand pages.  I think it's very reasonable

17   considering how much other work there is to do in this case.

18       THE COURT:   So go back to what you just -- I'm listening

19   on everything here.  Go back to what you just said about car.

20   See, I thought Karr had the 15 discs.

21       MR. FUKSA:   There is 21.

22       THE COURT:   I thought they had them.

23       MR. FUKSA:   They did.  Remember, Judge, in my motion I

24   pointed out that I didn't get them until September 27th

25   because they withheld them, and if your Honor recalls, Mr.

1    Michaels had issued a subpoena and we appeared before your

2    Honor.

3          THE COURT:   To Karr.

4          MR. FUKSA:   Right, to Karr, and then once they obtained

5    that, within a week they then said okay, you know, we will

6    produce those.

7          THE COURT:   So you have them already then?

8          MR. FUKSA:   Yes, I have them.

9          THE COURT:   Well, that's good.

10         MR. FUKSA:   And, Judge, really, we're going above and

11   beyond in producing these documents because there is so much

12   information, I could have said limit it to really the on point

13   discovery that is requested.   Instead, we're really giving

14   just everything that we have.   And in fact, which may not be

15   the best news for this court to hear, there is more documents

16   that we will be producing substantial, and it's not -- and I

17   don't want, you know, Mr. Michaels to say "Why are you

18   discovering these now" because some of them are as a result of

19   my client, who was recently in Poland, copying documents from

20   the prosecutor's file and also obtaining additional documents

21   from an office computer that they -- they kind of more were

22   geared toward or addressing other entities, but they're

23   looking through all these documents.

24         So all I'm saying is that I don't want to then surprise

25   the court by saying, "Oh, by the way, we found a couple more

1    hundred thousand or tens of thousands of documents."

2        MR. MICHAELS:  I would say on any document from the

3    prosecutor's office, the prosecutor has a big storehouse of

4    documents, which is part of the reason why his office was able

5    to create that (UI) or two.  He allowed all the parties access

6    to those records.  We have someone right now copying those

7    records and we're going to review them and then produce them,

8    so we don't need --

9        THE COURT:   You don't know whether they have been turned

10   over?

11       MR. MICHAELS:  I don't know what you guys copied from the

12   prosecutor's office.

13       THE COURT:   So do you have, do you have an inventory --

14   does somebody have an inventory of the documents that the

15   prosecutors have and could you share that with counsel?

16       MR. MICHAELS:  We are going to be preparing --

17       THE COURT:   Your own inventory.

18       MR. MICHAELS:  -- our own inventory that we would share

19   without waiving any privilege or work product or anything.

20       THE COURT:   Right, right.

21       MR. MICHAELS:  So we can I think put aside for today the

22   discussion of documents --

23       THE COURT:   In the future.

24       MR. MICHAELS:  -- from the prosecutor's office.

25       THE COURT:   Okay.

1       MR. MICHAELS:  In the -- to a future date.

2       THE COURT:  This sounds like -- these sound like

3 documents counsel did not know about, maybe weren't turned

4 over to the prosecutor either, so --

5       MR. MICHAELS:  Well, I mean, that's a whole separate set

6 of concerns --

7       THE COURT:  That's another -- yes, it is.  It is.  Okay.

8       MR. MICHAELS:  But as far as these hard drive

9 documents --

10       THE COURT:  All right so -- hang on, hang on, hang on,

11 I'm trying to -- okay, so we need the date for the plaintiff's

12 second set of interrogatories, these guys.  We need the

13 timetable for producing the hard drive, that's a discrete.  We

14 need a deposition schedule, and we need the production of

15 undisclosed bank accounts and bank records.  What's that?

16       MR. MICHAELS:  What that is, your Honor, is in

17 Document 2010 when you granted in part our motion to compel,

18 the motion covered two interrogatories and document requests

19 and the interrogatory was identify bank accounts that you had

20 at any point between '97 and the present and then to produce

21 records from those accounts.  We received responses that

22 identified a handful of bank accounts and we received a

23 handful of bank records.  As we reviewed those records, we

24 realized, we were looking at the bank records and oh, gee,

25 there is a check signed by one of the defendants from an

1    account that's not disclosed.  So we subpoenaed that bank.

2    All told, up to now we found 19 undisclosed bank accounts.

3    For 17 of them we were able to subpoena the records at our own

4    expense, which we shouldn't have had to do from the banks

5    themselves.

6         Two of those accounts are overseas, and we're not able to

7    obtain them by Rule 45 subpoenas.  One of the accounts and the

8    one that we're most concerned about is an account, and it's

9    been discussed in this courtroom before, of Adam Swiech's at

10   Julius Baer Bank in Switzerland.

11        From the first time we raised this issue Adam Swiech

12   denied having an account.  We then found some documents

13   showing transfers into this account.  He still denied having

14   the account.  I then found additional transfers into the

15   account.  So there is now 3 or 4 transfers we found and I have

16   the records that I could show you and I have given them to Mr.

17   Fuksa that shows the transfers into this account of Adam

18   Swiech at Julius Baer bank, and I then sent Mr. Fuksa a letter

19   with all the evidence and said Mr. Fuksa, please, our proposed

20   solution to this is to have Adam Swiech sign a letter to his

21   Swiss banker asking that the records be sent to Mr. Fuksa's

22   office because those records in our view are within clearly

23   Adam Swiech's -- he has legal access to those documents.

24        Now, Mr. Swiech's position, and instead of just denying

25   he knows anything about the account outright, is no, the

1   account belongs to my son, who is presently 19 or 20 years

2   old.  So in 2008 his son was approximately 16.  He is saying

3   the account in which you guys are alleging unlawful

4   transactions took place, that's my kid, he did it.  It's his

5   account.

6        So the dispute we're having now is, you know, our view is

7   that that's not credible in that Adam Swiech, who, by the way,

8   has given his son a power of attorney to act for him in Poland

9   in respect to all sorts of matters, still has effective

10  control over that account and needs to produce the records and

11  I have a letter here that he could sign and send to his banker

12  at Julius Baer and produce the records to us.

13       By the way, all the transactions we found in that Baer

14  account were directly relevant to this case and I attached to

15  the -- for each transfer we found, stapled together is the

16  flow of money where it can be traced back in most cases

17  directly to a KBP entity and then the money flows into Adam

18  Swiech's Swiss bank account or the one he now says was his

19  teenage son's respecting that.

20       THE COURT:   Is that the only bank record you're missing?

21       MR. MICHAELS:  The other account is an account belonging

22  to Derek Lewicki at HSBC in Poland.  Mr. Lewicki, from what I

23  gather from my conversations with Mr. Fuksa, Mr. Lewicki does

24  not deny ownership of the account or doesn't say that it's

25  some other Derek Lewicki's account, but he is taking the

1   position that "Well, I didn't open that account until later,

2   so you don't get to see it."

3       MR. FUKSA:   I mean, Judge, it is what it is.  The

4   account, what I have been told, is not the Adam Swiech who is

5   in lawsuit, it's the son.  And so if Mr. Michaels wants to get

6   those records, there is a process to do that, and furthermore,

7   my client Derek Lewicki said he would even try to facilitate

8   the process from what he knows by trying to explain some of

9   the transactions that were made as referenced in the documents

10  that Mr. Michaels provided.

11      With respect to the second HSBC account, my client has

12  told me that that was something that was opened in 2010 and

13  has nothing to do with --

14      THE COURT:   Well, he should have an opening document.  I

15  mean, if that were true --

16      MR. FUKSA:   Yes, I told him --

17      THE COURT:   I mean, if that were actually true, it did

18  open in 2010, I don't know when the fraud is, but I guess

19  under their theory, it's continuing until today.  So --

20  well --

21      MR. FUKSA:   He said he would obtain that for me, Judge,

22  the document creating the account.

23      MR. MICHAELS:  Mr. Lewicki himself, I think of those 19

24  undisclosed accounts, at least 12 of them were his.  So I

25  mean, to suggest that we ought to take his word for it in

1    this, we're past that point.

2        THE COURT:   Well, it's -- all right, all right.  So what

3    I'm trying to figure out, I can only do -- you know, I'm

4    trying to see what I can do without a motion and what has to

5    be motioned, okay, because I mean, somebody has to ask for

6    some specific relief, okay?

7        So let's go back to Karr for a minute.  Now let's go back

8    to these people.  What have you found out that Karr has

9    withheld, and apparently they're telling you, and by the by

10   me, too bad.  So what are they telling you?  And be careful

11   what you say, because I mean, how you're being told what --

12   are they telling you they have documents they're not giving

13   you?

14       MR. FUKSA:   Yes.  Those are the documents that we

15   produced in response to plaintiff's production request.

16       THE COURT:   So you don't have copies of those?

17       MR. MICHAELS:  Plaintiffs would have copies.

18       MR. FUKSA:   Plaintiffs would have them, right.  I

19   believe it's what Mr. Michaels had referred to as maybe 4,000

20   or 5,000 pages, actual physical pages --

21       MR. MICHAELS:  Mostly was produced in hard copy to us.  I

22   mean, we're -- I'm happy to go have it copied and send it back

23   to him.  We can't pay for it.  But if he wants those documents

24   back -- I mean those, just to be clear from the Gordon & Karr

25   standpoint, those were not the subject of our subpoena because

1    we had already received them from Gordon & Karr.  So our

2    subpoena was limited to things that we had not yet received

3    and it was really not -- you know, it was not for us to try to

4    make sure Mr. Fuksa had everything from them, we just wanted

5    the stuff that we had not seen yet.

6         MR. FUKSA:   I was just bringing that up, Judge, to

7    facilitate my production and really know what has happened in

8    this case because if I don't know what documents we have

9    produced, I don't have any of those, it's a difficult position

10   to be in.

11        MR. MICHAELS:  On that, we got to step back and look --

12   if they would just pay Gordon & Karr their fees, you would

13   have had the documents.  I mean, again, this is another

14   example of these guys rushing head long to further injure us

15   in Poland and here doing everything they can to gum up the

16   works.

17        MR. FUKSA:   You know what, Judge?  Maybe I could relay

18   the costs of copying these 4,000 or 5,000 pages and we will

19   probably -- I can't imagine it would be more than maybe a

20   couple of hundred dollars if we did it with some vendor and

21   maybe that will take care of it.

22        MR. MICHAELS:  I have a vendor if you want me to send

23   them to, and I'll send them to the vendor and then you can pay

24   the vendor.  I'm happy to do that at any time.

25        THE COURT:   Seems like the most direct way.

1      MR. FUKSA:   That shouldn't be a problem, I don't think,

2  Judge.

3      MR. MICHAELS:  They can pick them up.  I'll have them --

4      THE COURT:   I need to talk to Chris.  We will have a

5  five-minute break.

6      MR. FUKSA:   Thank you, Judge.

7      (Recess)

8      THE CLERK:  All right.  So I'm calling it that we had

9  five issues that I was aware of and you may have something

10  else, okay?  But let me do my five, okay?

11      First is the Karr documents.  Mr. Michaels is extremely

12  gracious, so that I don't have to get into a fight with the

13  Karr people, you make arrangements and get those documents if

14  you want them.  If you don't want them, you don't want them,

15  okay, or they can't afford them or whatever.  Okay.  So that's

16  number one.

17      Number two is between now and when you're coming back,

18  and we are going to talk about this in a minute, I want you to

19  look at the pros memo from Poland.  This is on the

20  interrogatories and the chart.  You're going to review the

21  pros memo, you're going to -- and you're going to look at --

22  Mr. Michaels is going to get you today, hopefully, if you

23  don't have a copy of or by Monday a copy of his answers to the

24  interrogatory.  He also told you that the complaint is a

25  roadmap of the entire thing too.  You're going to do a

1   sampling answer of ten of the answers because here is what

2   we're doing.  When you come back on this and the hard drive,

3   we're going to not -- we're going to make sure if we're going

4   to have a rolling production that you're doing it correctly,

5   because I don't want a rolling production and then four months

6   from now these fellows not answering or half answers or

7   something else, okay, because it's not just Mr. Michaels and

8   Mr. Fuksa.  I have had this case from day one -- no, not the

9   first four complaints and I know your clients were weary from

10  the number of complaints.

11      I understand all the history in the beginning.  But from

12  day one they have not lived up to their responsibility in this

13  lawsuit on producing things.  It's been excuse after excuse

14  after excuse, and I get paid to be patient.  So I have to be a

15  little bit more patient.  You're a young lawyer and I don't

16  personally want to hurt you as a result of it.

17      I'm as frustrated as Mr. Michaels is, okay?  I mean,

18  these clients, you have got to get a grip on these clients.

19  That's why when you come back we're going to have the sampling

20  of a couple of the tapes that you're turning over.  Mr.

21  Michaels is going to make a report and tell me, even if you

22  have to stay up all night, you're going to go through, and the

23  same thing on the hard drive because you're doing this rolling

24  production and you said two a week, or no, two a week?

25          MR. MICHAELS:    Right.

1    THE COURT:   Two a week.  So you're going to give him

2    two, he is going to take a look at them, he is going to make

3    sure he can read them, he can understand them, he -- what kind

4    of shape they're in, and you're going to give.

5        MR. MICHAELS:  So 10 transactions --

6        THE COURT:   10 transactions as a sampling.

7        MR. MICHAELS:  Right.

8        THE COURT:   And then you're going to see if they're

9    doing this.  Because before I give you four months or

10   something, I don't want to just leave it like that.  We are

11   going to do an interim checking and make sure we're okay.

12       As far as the Swiss bank goes, I'm throwing it back to

13   you, Mr. Michaels.  You figure out -- I have never understood

14   Swiss law.  You figure out what you want me to do.  If you

15   want to file a motion on that, you can file a motion.  If you

16   file a motion and say I should make them do it, you have got

17   to give me -- I don't know any law that says I can make --

18   maybe there is law that says I can make a client sign a

19   release, I don't know.

20       I mean, I don't know and you also find out if you want to

21   start the letters rogatory, although I don't think -- I don't

22   know whether Switzerland is part of it.

23       MR. MICHAELS:  I'm glad you mentioned that.  On the

24   letters rogatory process there are, just so you know, this

25   is -- I don't think this will be contested, but there are

1   certain witnesses who we need to get information from who we

2   are not in a position to get them to agree to travel to London

3   or Prague or anywhere elsewhere an American style is

4   permitted.  The evidence has to be gathered from them pursuant

5   to a letter of request process, which your Honor has to sign.

6       THE COURT:   Yes.

7       MR. MICHAELS:  We're going to be preparing letters of

8   request and getting them to you.

9       THE COURT:   Good, good.  They take sometimes 18 months,

10  okay?  So sooner better than later, and if there is any

11  authority that I could force a party to sign a release, you

12  get it to me.  I mean, I can't do any more, I can't do any

13  more than that, okay?

14      MR. MICHAELS:  Your Honor, I just want to -- that's fine,

15  obviously.  And would you have a -- I mean, in our view this

16  really is a -- they have already been ordered to produce this

17  stuff pursuant to the grant of the motion to compel in

18  December of 2010.  These are bank records.  This isn't like a

19  new motion to compel.  I don't know -- it's like a contempt

20  motion.  I don't know how to style it or --

21      THE COURT:   I don't know what to call it either and I

22  don't know if I don't have on a third-party, I mean, I don't

23  know if I have no jurisdiction -- I don't know.

24      MR. MICHAELS:  Okay.

25      THE COURT:   That's why this one I'm throwing back to

1   you.

2       MR. MICHAELS:  We will have to -- and I guess -- we will

3   just take whatever --

4       THE COURT:   Whatever relief you want.  Whatever relief

5   you want, okay?  And the deposition schedule is on hold at the

6   moment unless there is somebody you want to depose.  I mean,

7   it would seem to me that you would want to at least have the

8   records for the deposition.  So --

9       MR. MICHAELS:  And on that, your Honor, there is one

10  thing that Mr. Fuksa and I had something approaching an

11  agreement on.  There is one witness who we sent a subpoena to

12  who was a cousin of one of the defendants who shared an

13  account with her, another undisclosed account into which money

14  from KBP is coming every month.  We would depose her on

15  November 8th, but the two party depositions scheduled for the

16  9th and 10th, we will defer those until -- which would take a

17  lot more work to prepare for and Mr. Fuksa told me that Ms.

18  Draun, the cousin, doesn't know anything and in that case it

19  should be a very simple deposition and not take long.

20      MR. FUKSA:   This is what I'll say.  I would agree to

21  that with this limitation, that the questions directly stem

22  from the -- from what Mr. Michaels found, the joint bank

23  account of hers and Ms. Swiech's, because otherwise, I don't

24  want to get involved and be bombarded with all those other

25  documents that she has to look at and exhibits that she has to

40

1   look at and answer, and I'm completely clueless as to those.

2      I would limit it to the bank accounts, in which case he

3   could ask "Why were you on this bank account, did you ever

4   receive money from KBP," things of that nature.  That I'm fine

5   with.  Otherwise --

6      THE COURT:  So you're willing to bring her back for a

7   second dep?  I mean, are you willing to -- does she live here

8   or in Poland?

9      MR. MICHAELS:  She lives --

10      MR. FUKSA:  She lives here.

11      MR. MICHAELS:  -- here in northeastern Illinois near

12   Rockford.

13      THE COURT:  All right.  So are you willing if he needs

14   this for his subpoenas, you start the dep, limited to the bank

15   account.  If he has more questions of her later on, you agree

16   to a second dep, how about that?

17      MR. MICHAELS:  The trouble with that, your Honor, I don't

18   know if Mr. Fuksa even represents her.  We sent her the

19   subpoena and I'm not -- if there are objections he wants to

20   make to questions on relevance or anything else, make them on

21   the record.  I mean, you told me that she doesn't know

22   anything so assumedly, whatever I ask there is nothing to

23   prepare for.  Whatever I ask her about, she is going to say "I

24   don't know."  So I mean --

25      THE COURT:  Then you're finished.  So I guess that would

1   be easier.

2        MR. FUKSA:   Well, that's true, Judge, but I don't -- in

3   that case then, let's bring this to the table maybe at our

4   next interim meeting because if we can't be limited just to

5   the bank account, that's really the only thing that I have had

6   a chance to speak to my client about, is the bank account.

7   That's all I'm aware of that she was just placed on for no

8   really reason whatsoever, at least that relates to the

9   allegations of the complaint.

10       And so if we can't limit it, I would like an opportunity

11  to see what other information I would need to obtain before we

12  actually schedule this.

13       THE COURT:   All right.  So when is your -- okay, I'm

14  trying to figure out, because I want by the time you come

15  back, I want the sampling of the interrogatories from the

16  chart, the 10, and I want the 2 of the drive, so you said once

17  a week, so I'm assuming by next Friday.

18       MR. FUKSA:   We would have the two discs.

19       THE COURT:   Right.  So here is when I would like you to

20  come back, would be actually either the 8th or the 9th.  Do

21  you have a calendar?  I need to go get my calendar.  I need a

22  hard copy.

23       (Pause)

24       THE COURT:   All right.  If we did Wednesday -- no, hold

25  on.  I have two settlements on Tuesday.  How about if we did

1    Wednesday, November 9th, at 8:00 in the morning?

2        MR. MICHAELS:  8:00?

3        THE COURT:  Or 7:45.

4        MR. MICHAELS:  That's okay with me.  That was the date

5    for one of the party depositions that we agreed to defer.

6    It's the day after, however, the deposition for the cousin who

7    has the bank account.

8        THE COURT:  See, I don't think you're going to have time

9    to review if you're not going to get this stuff until Friday.

10       MR. MICHAELS:  Right.

11       THE COURT:  I mean, I want you to be able to tell me and

12   not -- maybe not with the precision, Mr. Michaels, because you

13   are a very precise person.  I'm not talking about your level

14   of precision, but if you can work with the stuff or you can

15   concretely say "Here is what I need," okay?  I want to put

16   this in fairness, okay?

17       And this is to help with the going forward too.  We're

18   not stopping and going back and get you better copies in the

19   next week because -- but hopefully, your suggestions, ideas

20   will help them to do it, okay?

21       MR. MICHAELS:  I understand that.  And that is a very

22   straightforward thing to do with respect to the interrogatory

23   responses.

24       THE COURT:  Right.

25       MR. MICHAELS:  With respect to the documents, there is

1    just going to be documents on two discs.  Some of them will be

2    in Polish that I can't read myself, but my clients help me

3    read, usually very quickly.

4         THE COURT:   Right.

5         MR. MICHAELS:  And all I could say is if they're in --

6         THE COURT:   We're going to know more than we know right

7    now because it's then this darn hard drive, this, you know, I

8    mean, at least somebody other than counsel, who has been in

9    the case two months and the clients looking at the hard drive,

10   somebody else is going to look at the hard drive.

11        MR. MICHAELS:  Well, yes, we would be looking at the

12   documents that supposedly came from the hard drive, but yes.

13   I understand the concept is let's get this test run done.

14        THE COURT:   Yes.

15        MR. MICHAELS:  Let's set a good pattern --

16        THE COURT:   Don't you agree this is a good idea, that at

17   least then -- so if you could come in, that's why I'm just not

18   thinking deps at the moment because you have got -- I would

19   really like to get us straight on what we need so we can get

20   these fellows, you know, getting this written stuff down.  So

21   whatever you want to do on your deps or you know, I'm not

22   going anywhere.  Nothing is going to hurt you and if you can't

23   agree -- he doesn't have to agree to limit it so maybe yours

24   is a motion to put it off until you know more about the case

25   then.  I don't know what it is, okay?

1      MR. FUKSA:  We will discuss that.

2      THE COURT:  So 7:45 on November 9th.  Now, so I had --

3  and then hopefully, the other thing that's going to happen is

4  if your clients are going to pay for this copying so that you

5  can get an idea on the documents you have got because you're

6  asking me for somewhat of an extension of fact discovery based

7  upon what you have to do, so you need to look at least to see

8  if that number of documents you're getting -- well, you speak

9  Polish anyway, but if -- how you're factoring that into it

10  too.

11      MR. MICHAELS:  And, Judge, there was one more issue on

12  the foreign account.

13      THE COURT:  Yes.

14      MR. MICHAELS:  On the Swiss bank one, I hear you back on

15  us, we'll figure out the right way to approach that.  On Derek

16  Lewicki's account at HSBC, our view is you had indicated that

17  the account records are responsive, he violated the order by

18  withholding them in the first place, and he ought to produce

19  them now.

20      THE COURT:  Well, you need to put that in a motion.  I

21  mean, I don't have a ruling in front of me.  That's not --

22  wait, is that his kid's?

23      MR. MICHAELS:  No, that one is not a kid.  He admits it's

24  his own account.  He is just saying "Well, take it from me, I

25  opened it later so I shouldn't have to produce the records."

1   There is an order entered --

2        MR. FUKSA:   Judge, in any event, in any event, I would

3   then object anyway if in fact it's not responsive to the

4   allegations of the complaint, and maybe what we could do, as

5   your Honor mentioned, is by that date have my client produce

6   the paperwork regarding the opening of the account, to show

7   when it was opened.

8        MR. MICHAELS:  I mean, to us that doesn't advance the

9   ball because even if he happens to be telling the truth about

10  this one, whenever it was opened, we believe that it's still

11  relevant in that, you know --

12       MR. FUKSA:   In that case, Judge --

13       MR. MICHAELS:  -- they have withheld 19 accounts they

14  didn't disclose to us.  I mean, at some point there is a

15  consequence for something, you know.

16       MR. FUKSA:   In that case, Judge, I mean, when do we stop

17  the discovery?  How do we limit the discovery?  Is it to be

18  for every single thing that's done everyday going forward,

19  whether it be opening a bank account or buying a car is

20  subject to discovery?

21       THE COURT:   That's up to Judge -- that's a legal issue

22  for Judge Bucklo, not for me.  I mean, right now discovery is

23  broader than -- I mean, discovery is broad.  So I haven't

24  got -- I mean, unless somebody brought something to me -- but

25  this is 2010.  This isn't today anyway.  You --

1      MR. JASZCZUK:   Your Honor, I have been very quiet for

2    most of this time.

3      THE COURT:   You have.

4      MR. JASZCZUK:   I have tried to stay out of this and let

5    them take care of it, but at this point I do have some

6    thoughts I want to share with the court.

7      In virtually every case I have ever been involved in, the

8    discovery, even if it's broad, is relevant to the point that

9    the complaint is filed, because the complaint by its nature

10   alleges certain things happening, which has to have been part

11   of the complaint.

12     So this would be the first case I have ever been involved

13   in where discovery two years post complaint being filed, which

14   the allegations have nothing to do with, would be considered

15   relevant.

16     Now, I understand that Mr. Michaels is saying it's an

17   ongoing thought, but if he feels that there are other issues,

18   you know, that are still ongoing, he needs to amend his

19   complaint to bring those within it.

20     So while I don't have strong views on many of the things

21   that are discussed, if we're going to move discovery forward

22   on things that happened after the complaint was filed, then

23   that's going to open, I believe, a Pandora's box of additional

24   documents and testimony from additional people because hey,

25   who knows who opened how many accounts yesterday or the day

1    before or at any time after the complaint.  So --

2        MR. MICHAELS:  While I appreciate Mr. Jaczczuk's efforts

3    to help Mr. Babitzsky on this point, I think that we allege an

4    ongoing fraud, that's what the complaint alleges.  We

5    certainly intend to amend, as plaintiffs often do, to conform

6    to proof.  The scope of discovery is far broader than

7    documents that you can trace with a black line directly to a

8    particular transaction alleged in this complaint.

9        As Judge Bucklo's order denying their motions to dismiss

10   made clear, this complaint is extraordinarily detailed, it's

11   extraordinarily precise, and it clearly alleges an ongoing

12   fraud.  He didn't only withhold the account that's supposedly

13   opened in 2010, he withheld accounts that were used throughout

14   this fraud.  He withheld accounts in names of entities that he

15   failed to disclose to us.

16       MR. FUKSA:   Judge, first of all, the whole withholding

17   and these allegations, I'm not -- I've got to accept that

18   because there were different attorneys that represented my

19   clients at that point.

20       What I have seen and as a result of me being able to get

21   these documents is there has been a very strong lack of

22   communication between the attorneys and the clients with

23   respect to "Listen, this is what you have to get done because

24   when it comes to trial and you're trying to prove your case,

25   these are the things you're going to have to show as well."

1    So.

2         I have made that clear to them, okay, and so I think

3    they're going to be very responsive.  I just don't think they

4    were sat down and told -- maybe it was an issue of language

5    lost in translation, but the other thing is so -- first of

6    all, I don't like Mr. Michaels saying that they have withheld

7    these and they were being deceptive, whatever else.

8         With respect to this 2010 account, I mean, if at least

9    there was an allegation in the complaint saying in 2010 there

10   was a transaction such that blah, blah, blah, then I would be

11   singing a different tune.  There is no allegation of a

12   transaction in 2010 that was suspicious or fraudulent, so how

13   could it possibly -- how could the discovery possibly be

14   subject to --

15        THE COURT:  Okay.  So I love the fact that I'm trying to

16   save you guys some motion practice, okay?  But just like I

17   don't know on the Swiss bank account, to me it seems like

18   there is a number of questions there, legal questions there,

19   not factual, not that I can come up with some band-aid over.

20        The rest of these things I'm kind of doing triage, okay?

21   I can't do triage on the end date of the scheme.  I mean, we

22   can all go look -- we can all go look at the complaint when

23   we're finished.  The government in every case -- I was a

24   criminal defense lawyer -- ran conspiracies up to the day we

25   went to trial.  It's not unusual at all.  I know it's

1    criminal, it's not civil, but I know that's not unusual and it

2    usually is a question of proof, I don't know, but if you want

3    to give -- if you want to -- sounds like Mr. Michaels is kind

4    of getting revved up to say Mr. Lewicki failed to comply with

5    your order of X, okay?

6         So he would, you know, file some kind of a pleading

7    saying "I need you to compel him to do it" or you know, worse,

8    okay?  Then you would come in and you would say da, da, da,

9    da, da, whatever you say, okay?  I can't go beyond that

10   because that really is a legal issue, okay?

11        MR. MICHAELS:  Maybe what we could do is this.  If he

12   wants to substantiate the assertion that the account was

13   opened --

14        THE COURT:   You need that piece of paper.

15        MR. MICHAELS:  -- that at a minimum ought to be provided

16   and then --

17        THE COURT:   Before they offer to do it.  Before you

18   come --

19        MR. MICHAELS:  And then --

20        THE COURT:   But you need to, sir, because it's not just

21   Mr. Michaels here, okay?  Representations were made to this

22   court and to Judge Bucklo, okay?  You know, it's been like a

23   "trust me" from the beginning and we kept because of the

24   Polish language being interjected, because the documents were

25   in Poland, because they would stand here and they would be so

1    exasperated because we're on the 7th amended complaint and

2    everybody bailed, okay?

3         I can take judicial notice of the fact their lawyers all

4    bailed on them.  Dienner bailed on them, okay?  So we're not

5    writing on a clean slate here.  So you need to have a really

6    good heart-to-heart that this isn't just -- I mean, they first

7    have to be straight with you, but between my court and Judge

8    Bucklo's court these are going to be the people who are going

9    to be making decisions for these fellows and I think I even

10   said bring them in.  Let them tell me -- I mean, it just

11   doesn't look very credible, and I think it's more than foreign

12   language.

13        MR. FUKSA:   Well, with respect to this account, Judge,

14   the only reason really I need to object to this is so that

15   tomorrow another subpoena doesn't go out for another bank

16   account or for purchase of a vehicle.

17        THE COURT:   All right.  Well, then you will -- I mean,

18   we will see how Mr. Michaels is going to handle that, okay?

19   And then I'm going to give you plenty of time to answer it,

20   but I do think as a preliminary it would help if you gave him

21   under our theory that it was opened in 2010, you would give

22   him the papers that would show that.

23        MR. MICHAELS:   The best way I could see to proceed would

24   be if he would, without any further process from us, provide

25   the account opening documents.

1     THE COURT:   Right.

2       MR. MICHAELS:   Saying "The account was opened in 2010,

3   our position is we therefore don't have to produce any records

4   from it."  We would fold into whatever motion we bring on the

5   Swiss account, we would fold into it a discussion if we decide

6   to (UI) this account because they're really both keying off

7   the same order from 2010.

8       THE COURT:   Right.  Okay?  And then you would be able to

9   answer both, and you don't have to do that by a week from

10  Wednesday because you have got enough homework.

11      MR. FUKSA:   So I know your Honor set the date for coming

12  back.  How about the date for the time in which I actually

13  have to tender these --

14      THE COURT:   Next Friday you're turning over -- your two

15  weeks, I mean your first disc, your first disc next Friday.

16      MR. FUKSA:   Right.

17      THE COURT:   Two discs, yes, you said two discs a week,

18  and I would like the 10 sampling by next Friday too.  But at

19  least by Monday before you come back because in order to keep

20  up with your January date we have got to see if we're -- and I

21  need copies -- I would like to see -- I mean, I don't want two

22  CD ROMs, but I wouldn't mind if I saw your interrogatory

23  answers you give them, if you dropped off a copy.

24      MR. MICHAELS:   I'll send those over -- do you want them

25  electronic or should I just walk a hard copy over?

1        THE COURT:   Electronically to Chris.  I just want to see

2   them before I come out on the bench.

3        MR. MICHAELS:  Oh, sure.  I would just need Chris' e-mail

4   and I'll e-mail them and I'll CC (buzzing in microphone).

5        THE COURT:   It's on our website.

6        MR. MICHAELS:  The last thing here is those -- the party

7   depositions that were scheduled for early November we are

8   willing to defer and we will just revisit the issue.

9        There were the depositions in London of these third

10  parties that I would like to address again when we are back

11  because there are -- there are certain of those people that

12  really probably don't need the documents from Richard Swiech's

13  hard drive from --

14       THE COURT:   And you have dates.

15       MR. MICHAELS:  And we have been talking about dates with

16  these people, and there are some logistics involved and so I

17  just want to make clear that I'm not agreeing that we're not

18  going to take those in early December.  We could talk about

19  moving them back a week or two, and --

20       THE COURT:   Well, you don't need -- you're taking the

21  deps.

22       MR. MICHAELS:  Yes.

23       THE COURT:   And if you don't need the documents, you

24  can't come back to me six months from now and say "I need to

25  retake them."  I mean, if you're willing to go ahead, maybe

1    that would be a good use then.

2         MR. FUKSA:   I just can't imagine --

3         THE COURT:   You need to talk about it.  Well, you're not

4    going to -- most of the time the other person sits like a

5    potted plant anyway at the dep.  I mean, what the heck are you

6    going to do except go to London and make sure he doesn't say

7    anything to --

8         MR. FUKSA:  I understand, Judge.  My position is I

9    just -- I would really wish that we wouldn't have to do this

10   until that January -- until after that January date --

11        THE COURT:   I know, I know, I know, but if Mr. -- okay,

12   I don't know who they are, I don't know anything so we will

13   put that on the agenda to discuss, but you guys have a real

14   discussion on that too, okay?

15        MR. FUKSA:    Okay.

16        MR. JASZCZUK:   I would like to be involved in that too.

17        MR. MICHAELS:  Certainly.  Thank you very much.

18        MR. FUKSA:    Thank you, Judge.

19        THE COURT:   Oh, here is your -- there you go.  So when

20   you -- Mr. Michaels, when you give us -- I don't think we have

21   that list either.  So I don't need it today, but when you do

22   the sampling of the 10, attach it so we have it.

23        MR. MICHAELS:  I will attach both that -- I will also --

24   I will attach as a separate document.  I'll send you the

25   interrogatory responses and the -- that's an integrated

1   chronological list of transactions.

2          THE COURT:   Okay.

3          MR. MICHAELS:  Okay.  Thank you.

4          THE COURT:   All right.

5              *                    *                    *

6

7          I certify that the above was transcribed was

8          digital recording to the best of my ability.

9          /s/ Lois A. LaCorte

10         _____          _____

11             Lois A. LaCorte                      Date