## United States District Court
### For The Northern District Of Illinois
### Eastern Division

Krakow Business Park Sp. z o.o in
Liquidating Bankruptcy, et al.,

       Plaintiffs,

    v.

Locke Lord, LLP, et al.,

       Defendants.

No. 08 CV 4922

Judge Manish S. Shah

### Memorandum Opinion And Order

Jan Domanus and Andrew Kozlowski are shareholders of a Polish corporation called Krakow Business Park (KBP) and several of its subsidiaries. Domanus and Kozlowski claim that, beginning in 1997, some of the companies' other shareholders—including Adam Swiech, his brother Richard Swiech, and Derek Lewicki—began to steal from the businesses through a series of fraudulent transactions. In 2008, Domanus and Kozlowksi filed in federal court a civil action against Lewicki and the Swiech brothers (and others), alleging violations of, among other things, the Racketeer Influenced and Corrupt Organizations Act. Domanus and Kozlowski brought their suit both directly and derivatively, so the KBP entities were added as nominal defendants to the complaint.

John Dienner, an attorney at Kubasiak, Flystra, Thorpe & Rotunno, was counsel of record for the KBP entities from August 2010 to October 2011. Several

attorneys from Locke Lord LLP took over the representation in 2011, remaining counsel of record until their disqualification in May 2012. Two years later, the corporations entered bankruptcy proceedings in Poland, and the companies—now under the control of a trustee—were realigned as plaintiffs in the pending suit.

Following realignment, plaintiffs (which now included Domanus, Kozlowski, and the realigned KBP entities) filed supplemental complaints against the attorneys who had represented KBP. Plaintiffs claim that the lawyers—Dienner and several attorneys at Locke Lord—joined the original defendants' ongoing RICO conspiracy. The lawyer defendants move to dismiss the claims against them. For the reasons discussed below, the motions are granted.

## I.    Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint need not include specific facts, but it must provide the defendant with fair notice of what the claim is, and the grounds upon which it rests. *Olson v. Champaign Cnty., Ill.*, 784 F.3d 1093, 1098–99 (7th Cir. 2015) (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The complaint must present enough factual matter, accepted as true, that the claim to relief "is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *Firestone Fin. Corp. v. Meyer*, — F.3d —, No. 14-3075, 2015 WL 4720281, at *3 (7th Cir. Aug. 10, 2015) (citing *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013)). In considering

a motion to dismiss under Rule 12(b)(6), the district court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *Firestone*, 2015 WL 4720281, at *3 (citations omitted); *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013) (quoting *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010)).

## II.    Facts

### A.    The Formation and Operation of KBP

Krakow Business Park (KBP) is a Polish company involved in the development of certain real estate near Krakow, Poland. Specifically, the company oversees the construction and management of several large office buildings that make up the business park. *See* Third Amended Complaint, [210] ¶ 22; Supplemental Complaint, [755] ¶ 1 (incorporating by reference paragraphs 1 through 97 of the Third Amended Complaint); Second Supplemental Complaint, [770] ¶ 1 (same).[1] KBP also has twelve wholly-owned subsidiaries (KPB-1 through -11, and KBP-TT), created to own the individual office buildings in the park. *See* [210] ¶ 23. As of April 2010, five such buildings had been completed. *See id.*

After its formation in 1997, KBP had six primary shareholders, which included (among others) Adam Swiech; Adam's brother, Richard Swiech; Derek Lewicki; and Andrew Kozlowski. *See id.* ¶ 28. Jan Domanus became an additional

---

[1] Citations to the record are designated by the document number as reflected on the district court's docket, enclosed in brackets; referenced page numbers are from the CM/ECF header placed at the top of filings. The facts related in this opinion are taken largely from plaintiffs' third amended complaint and first and second supplemental complaints, as well as prior court proceedings in this case (*see Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013) (citation omitted); *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012) (citations omitted)).

shareholder in 2000. *See id.* ¶ 31. Domanus and Kozlowski claim that, starting in 1997, Adam Swiech (who was also president of the company) coordinated with his brother Richard and with Lewicki to misappropriate assets from KBP and its subsidiaries. *See id.* ¶¶ 29, 34. According to Domanus and Kozlowski, Lewicki and the Swiech brothers concocted and executed an elaborate scheme to loot the business through a series of misdeeds, which included, among other things: (1) causing KPB and its subsidiaries to enter sham contracts with Lewicki or the Swiechs (or with other companies owned or controlled by them), pursuant to which KBP paid those individuals (or companies) for services that were never performed, or for land at intentionally-inflated prices, *see id.* ¶¶ 34, 36–49; (2) causing KBP's subsidiaries to lease office-building space at below-market rates to a company controlled by the Swiech brothers, who then caused that company to lease the same space to third-party tenants at market rates, *see id.* ¶¶ 34, 50–51; (3) misappropriating from KBP's subsidiaries various parcels of land, collectively worth about $28 million, *see id.* ¶¶ 34, 52–53; and (4) demanding and receiving kickbacks from building contractors, paid for by KBP's subsidiaries in the form of artificially increased construction costs, *see id.* ¶¶ 34, 54–57.

Lewicki and the Swiech brothers funneled a portion of the misappropriated funds to Chicago-area businesses and properties managed by those individuals. *See id.* ¶ 63. Adam Swiech, meanwhile, reinvested some of the stolen assets back into KBP as "capital contributions"—thereby augmenting Adam's ownership percentage in the company and diluting Domanus's and Kozlowski's shares. *See id.* ¶ 58. Adam

also worked with his brother and Lewicki to scuttle a deal with a Luxembourg-based company that had agreed to buy all of KBP's outstanding shares. *See id.* ¶¶ 61–62.

### B.    Criminal Charges in Poland

In August 2008, Polish authorities arrested Adam Swiech in connection with his conduct at KBP, charging him with, among other things, money laundering, conversion, forgery, tax evasion, and leading an organized crime ring. *See id.* ¶¶ 10, 73. As a result of his arrest, Adam was forced to resign from his positions as president and sole management-board member of KBP. *See id.* ¶¶ 73, 75. Adam was able to retain de facto control over the business, however, by using his majority shares (obtained through the "capital contributions") to appoint friends and family members—including his brother, Richard, and Adam's and Richard's respective wives—to key management positions; he also voted his shares to amend KBP's articles of incorporation, now permitting a single board member (rather than a majority of members, as was formerly required) to bind KBP. *See id.* ¶¶ 73–75; [755] ¶¶ 41, 156. In February 2014, Adam was convicted on the first set of charges filed against him (*i.e.*, filing with a Polish court KBP shareholder minutes containing forged signatures). *See* [755] at 2 n. 1. A trial on the other charges was (as of August 2014) set for early 2015, *see id.*, but there is no information in the record about the outcome of that trial.

Richard Swiech and Lewicki were also charged by Polish authorities with crimes related to their activities at KBP. *See* [210] ¶¶ 6, 8. Lewicki was arrested in

Poland, and was imprisoned there for a time, but was later released on bail. *See id.* ¶¶ 6, 76–77. There is no information in the record about the outcome of the prosecutions against Richard Swiech or Lewicki.

### C. The Civil Suit Against Lewicki and the Swiechs

In August 2008, Domanus and Kozlowski filed suit against Lewicki, the Swiech brothers, and several other defendants—including Lewicki and Richard Swiech's wives—alleging violations of RICO, 18 U.S.C. § 1961 *et seq.*, and state law. *See* [1], first amended at [51]. Domanus and Kozlowski brought their claims both individually and derivatively on behalf of KBP (though neither of the first two complaints named KBP as a party). *See id.* KBP and its subsidiaries were ultimately added as nominal defendants to the third amended complaint, [210].

Domanus and Kozlowski later filed a motion for default judgment against Lewicki and the Swiech brothers. *See* [612]. The motion was granted as a sanction for the defendants' misconduct during the litigation. *See* [657]. Although default was granted on both the direct and derivative claims, Domanus and Kozlowski moved to stay a prove-up on the latter. *See* [664]. That motion, too, was granted, and briefing on damages for the derivative claims was deferred. *See* [666].

The defaulting defendants then moved to stay the prove-up of damages for the direct claims, arguing that a prove-up of claims against only some of the individual defendants would be inappropriate under Supreme Court and Seventh Circuit precedent. *See* [671] at 2–6 (discussing *Frow v. De La Vega*, 82 U.S. 552 (1872); *In re Uranium Antitrust Litigation*, 617 F.2d 1248 (7th Cir. 1980)). This

6

motion to stay was denied, [677], and final judgment was entered against the defaulting defendants under Federal Rule of Civil Procedure 54(b), [698]. Approximately $413 million in damages were assessed against Lewicki and Richard and Adam Swiech on the direct RICO claims. *See id.* at 3 (entering judgment in the amount of $137.8 million, trebled under 18 U.S.C. § 1964(c)).

Lewicki and the Swiech brothers appealed both the order of default and the order denying their motion to stay prove-up of the direct claims. *See* June 28, 2013 Notice of Appeal, [704]. The Seventh Circuit determined that the default judgment was appropriate, and that the district court had not abused its discretion in denying the defendants' motion to stay the direct-claims prove-up because the plaintiffs had agreed to dismiss all claims[2] against the non-defaulting defendants: so there was no risk of an inconsistent damages award, as the defaulters had argued. *See Domanus v. Lewicki*, 742 F.3d 290, 302, 304 (7th Cir. 2014). Following the court of appeals' decision, Domanus and Lewicki dismissed all direct claims against the non-defaulting defendants, as promised. [726]; [732]. The non-defaulters then moved for summary judgment on the still-pending derivative claims. [741]. Those claims against the non-defaulters were voluntarily dismissed. [750] at 4; [754].

By April 2014, KBP had entered bankruptcy proceedings in Poland, and a trustee had assumed control over the corporation and its wholly-owned subsidiaries. *See* Plaintiffs' Unopposed Motion for Entry of Stipulated Order, [750] at 2. The companies were now willing and able to pursue on their own behalf the claims

---

[2] The parties debate whether Domanus and Kozlowski agreed to dismiss just the direct claims or both the direct and derivative claims. This issue is discussed further below.

formerly designated as "derivative." *See id.* The corporations were realigned as plaintiffs. Then plaintiffs—which now included Domanus, Kozlowski, and the KPB entities—asserted claims against the attorneys who had represented the entities before realignment. *See* [755] (supplemental complaint); [770] (second supplemental complaint).

### D.    Plaintiffs' Claims Against the KFTR and Locke Lord Attorneys

Plaintiffs claim that the attorneys who represented the KBP entities before realignment—first Dienner (at KFTR), then Jaszczuk, Safer, and Schlessinger (at Locke Lord)—betrayed their true clients in favor of helping the Lewicki/Swiech defendants, and in so doing joined the latter's RICO conspiracy.

#### 1.    *Allegations Against Dienner and KFTR*

John Dienner, an attorney with the law firm of Kubasiak, Fylstra, Thorpe & Rotunno, P.C., was counsel of record for the KBP entities from August 2010 to October 2011. *See* [269]; [431]. He was recruited to represent KBP by Richard Karr at Gordon & Karr, LLP, an attorney for the Lewicki/Swiech defendants. *See* [770] ¶¶ 5, 27.[3] Dienner met with Karr and Richard Swiech in June 2010 to discuss the engagement, and it was made clear to Dienner that he would be expected to work with the Gordon & Karr attorneys—at the defendants' direction—to defeat the claims against those defendants. *See id.* ¶ 27. Dienner agreed to the engagement on KFTR's behalf, and e-mailed a draft engagement letter to Richard Swiech. *Id.* ¶ 28. Swiech instructed Dienner to instead send the letter to a lawyer named Janusz

---

[3] For simplicity, the Lewicki/Swiech defendants are sometimes referred to only as "defendants" or "the individual defendants."

Dlugopolski, KBP's attorney in Poland. *See id.* (Dlugopolski was also Adam Swiech's criminal lawyer in Poland. *See id.*) Dienner sent the letter to Dlugopolski, who executed a revised version of the agreement on behalf of KBP. *See id.* ¶ 29.

### a. The Motion to Quash

After Dienner was retained to represent KPB, he began working on a motion to quash service on the corporation. *See id.* ¶ 54. Dienner drafted the motion solely at the direction of the defendants and their counsel at Gordon & Karr, and performed no independent assessment to determine whether filing the motion would be in KBP's best interest. *See id.* Dienner also worked closely with the defendants and their counsel in responding to discovery requests concerning the motion to quash. He consulted with Gordon & Karr about responding to interrogatories and document requests, *see id.* ¶¶ 55–56, and he stopped trying to obtain responsive documents after Karr asked him to "consider a more aggressive path," because the "clients [were] getting desperate for a dismissal and the court's jurisdiction over KBP may be their last best hope." *Id.* ¶¶ 56–57 (quoting November 15, 2010 E-mail from Richard Karr to John Dienner, [770-6] at 2–3[4]).

Dienner continued to work with the defendants' attorneys when drafting the reply brief for the motion. *See* [770] ¶ 58. He attached to the brief an affidavit signed by the then-acting president of KBP (and alleged criminal), Dariusz Burek. *See id.* It was defendants' counsel, however, who prepared the draft affidavit, and

---

[4] The November 2010 e-mail was attached as an exhibit to plaintiffs' complaint against Dienner, and is considered a part of that pleading. *See* Fed. R. Civ. P. 10(c); *Olson v. Bemis Co., Inc.*, — F.3d —, No. 14-3563, 2015 WL 5011951, at *7 (7th Cir. Aug. 25, 2015).

Dienner filed it with only minor revisions—without first checking to see if the statements in the affidavit were true (which plaintiffs say there were not), or if Burek was competent to make them. *See* [770] ¶ 58.

Domanus and Kozlowski moved to strike the Burek affidavit, and Dienner let the attorneys at Gordon & Karr prepare the response to that motion. *See id.* ¶ 59. The motion to strike also addressed the corporation's need for independent counsel—an issue raised earlier by Domanus and Kozlowski in a prior filing. *See id.*; *see also* Plaintiffs' Motion to Strike Declaration of Dariusz Burek, [359] at 3; Plaintiffs' Response in Opposition to the KBP Entities' Motion to Quash Service of Summons and For Other Relief, [353] at 13–14. In response, Dienner argued that plaintiffs had previously conceded that Dienner "appears to be independent," but he did not disclose that he had been working with the defendants. *See* [770] ¶ 59; *see also* Derivative Defendants' Response to Plaintiffs' Motion to Strike Affidavit of Dariusz Burek, [364] at 7 n. 2.

The court denied the motion to quash (which was also, in the alternative, a motion to dismiss for lack of personal jurisdiction). *See id.* ¶ 60; [368] at 20–25. A few months later, Dienner wrote to Lewicki:

> I advised Mr. Dlugopolski that the US Supreme Court recently decided two new cases which confirmed that for a local court to have jurisdiction over a foreign defendant, that defendant must have engaged in conduct within Illinois. . . . I recommended that we file a new motion to dismiss. . . . A new motion to dismiss should be granted because . . . the plaintiffs do not allege that the companies engaged in any Illinois conduct. . . . [I]t is important to file this motion [because] the largest monetary claims are the derivative claims against the companies. If the court has no jurisdiction over the companies, it has no jurisdiction over the derivative claims against them . . . .

10

> That would leave only the personal claims against the defendants. Those smaller claims might not be worth litigating.

September 9, 2011 E-mail from John Dienner to Derek Lewicki, [770-7] at 2.[5] But Dienner did not file another motion to dismiss.

### b.    The Billing Scheme

Plaintiffs claim that Dienner also agreed to participate in a fraudulent billing scheme devised by the Lewicki/Swiech defendants and their attorneys at Gordon & Karr. Before Dienner was retained to represent KBP, Gordon & Karr had entered into an agreement with some of the KBP entities to represent them as well as the Lewicki/Swiech defendants. *See* [770] ¶ 30. Gordon & Karr's billing invoices were addressed directly to KBP (so that KBP would pay them, which it did), but the invoices did not identify the client for whom the invoiced services had been performed, or the particular attorneys who had performed them; the invoices stated only that services had been provided in connection with the "Polish Litigation." *See id.* The descriptions of these services were similarly vague. *See id.*

When Dienner was retained in August 2010, Gordon & Karr's July 2010 invoice to the KBP entities was still outstanding. *See id.* ¶ 32. Lewicki e-mailed Karr, explaining that KBP was ready to pay the July invoice but payment would have to go through Dlugopolski (the company's attorney in Poland) and Dienner. *See id.*; *see also* August 4, 2010 E-mail from Derek Lewicki to Richard Karr, [770-2] at 2. Lewicki stated that certain changes would have to be made to the invoice, and

---

[5] The September 2011 e-mail, as well as other e-mails (from August 2010 and November 2010) discussed below, were attached as exhibits to plaintiffs' second supplemental complaint.

attached to his e-mail a copy with the needed revisions. *See* [770] ¶ 32; [770-2] at 2–6. Lewicki instructed Karr not to send any billing correspondence to KBP, but to Dlugopolski instead. *See* [770] ¶ 33; [770-2] at 2.

As Lewicki had requested, Dienner—to whom Karr had forwarded Lewicki's message, *see* [770] ¶ 32; August 5, 2010 E-mail from Richard Karr to John Dienner, [770-2] at 2—removed Gordon & Karr's letterhead (which included the firm's name and address) from the invoice, leaving that space blank, *see* [770] ¶ 35. He did attach to the invoice a cover letter, in which he acknowledged that the services described were provided by Gordon & Karr, but he also attached an additional invoice from KFTR (for its retainer fee), and in the cover letter sought payment to only KFTR for the fees due both firms. *See id.* Dienner e-mailed the invoice package, as instructed, to Dlugopolski. *See id.* When Dlugopolski later wired KFTR the payment due Gordon & Karr (the payment for KFTR's retainer fee was apparently wired separately), Dienner wrote a check to Gordon & Karr for the transferred amount. *See id.* ¶ 36.

Dienner followed the same approach—minus the invoice for KFTR's retainer—in the ensuing months, but the bills went unpaid. *See id.* ¶¶ 37–38. Then, in November of that year, Lewicki sent Karr an e-mail with an attachment, explaining: "this is the version of invoice which will be safe for them. Don't ask why, don't make any comments I know it's stupid." *Id.* ¶¶ 38–39; November 15, 2010 E-mail to Richard Karr, [770-3] at 2. The attachment was Dienner's September 2010

12

(as-yet-unpaid) invoice package. *See* [770-3] at 3–11. Typewritten onto the documents were various changes suggested by Lewicki. *See id.*

Karr forwarded the e-mail and attachment to Dienner, and the two spoke with Lewicki through Skype. *See* [770] ¶¶ 38, 44; November 15, 2010 E-mail from Richard Karr to John Dienner, [770-3] at 2. Together, the three agreed that Gordon & Karr would redact from its own invoices any references to Lewicki's name (as Lewicki had requested, *see* [770-3] at 7), and that Gordon & Karr would continue to forward its (redacted) invoices to Dienner, who would in turn continue to remove from the letterhead Gordon & Karr's identifying information, leaving it blank. *See* [770] ¶ 44. It was also agreed that Dienner would begin to redact from KFTR's invoices the "Invoice Summary" section, which in prior billings had denoted the total fees and expenses incurred by KFTR, and that he would now refer in his cover letter simply to "Additional Legal Services" rather than to services provided by Gordon & Karr. *See id.* ¶ 44.

Pursuant to their new agreement, Karr and Dienner each revised their firm's August and September 2010 bills and composed their October 2010 bills in a similar fashion. *See id.* ¶ 45. Before he could send the new invoice packages to Dlugopolski, however, Dlugopolski sent him an e-mail rejecting the outstanding (unrevised) August and September invoices that had never been paid, stating that they could not be paid because they sought payment for Gordon & Karr's services, while it was KFTR who was representing the company. *See id.* Baffled, Dienner questioned Karr, who told him simply to send to Dlugopolski "the revised bill the way we

discussed." *Id.* ¶ 46 (quoting November 17, 2010 E-mail from Richard Karr to John Dienner, [770-4] at 2). Karr explained that Dlugopolski's e-mail had been sent for cover. [770] ¶ 46; [770-4] at 2.

Dienner sent Dlugopolski the revised invoice package, and received on December 8, 2010 a letter purporting to be from a KBP board member. *See* [770] ¶¶ 47–48. The letter stated that KBP agreed to pay the total invoiced amount on the assumption that that amount represented fees and expenses incurred by Dienner. *See id.* ¶ 48. Although more than 70% of the invoice was for Gordon & Karr's services, not Dienner's or KFTR's, Dienner made no comment and Dlugopolski wired the entire payment to Dienner. *See id.* ¶¶ 48–49. As he had done before, Dienner wrote out a check to Gordon & Karr for the latter's share of the bill. *See id.* ¶ 49. Dienner continued to prepare invoices in this way through September 2011. *See id.* ¶¶ 50–51. (By fall 2011, Karr and Dienner had learned that the defendants intended to replace Gordon & Karr and KFTR as the law firms representing the defendants and KBP, respectively. *See id.* ¶ 52.)

Plaintiffs' complaint against Dienner includes one RICO claim—conspiracy to violate RICO, in violation of 18 U.S.C. § 1962(d) (Count I)—and five claims under state law: civil conspiracy (Count IV), legal malpractice (Count VI), breach of fiduciary duty (Count V), aiding and abetting a breach of fiduciary duty (Count III), and aiding and abetting fraud (Count II). *See id.* ¶¶ 92–121. All counts are also brought against KFTR under a theory of vicarious liability. *See id.* ¶¶ 97, 103, 108,

14

112, 117, 121. Dienner and KFTR each filed a motion to dismiss the claims against them. [787]; [791].

### 2. *Allegations Against the Locke Lord Attorneys*

In the fall of 2011, Locke Lord LLP replaced KFTR as the law firm representing KBP in the ongoing litigation. Three of the attorneys on the Locke Lord team were Martin Jaszczuk, Jay Safer, and Daniel Schlessinger. Plaintiffs claim that, like Dienner, these attorneys also joined the Lewicki/Swiech defendants' RICO conspiracy.

### a. Locke Lord's Engagement and Billing Procedures

Locke Lord was first contacted about representing the KPB entities in May 2011. *See* [755] ¶ 22. Szymon Gostynski, a Polish lawyer who knew the Lewicki/Swiech defendants, reached out to Jay Safer about taking on the case. *See id.* At the time, and as discussed above, the KBP entities had different counsel (Dienner at KFTR) than did the Lewicki/Swiech defendants (Karr at Gordon & Karr), but Gostynski wanted Locke Lord to take over for both; he made clear to Safer that Locke Lord's role would be to defeat Domanus and Kozlowski on the merits of their claims. *See id.*

Safer asked Jaszczuk and Schlessinger, two other attorneys at Locke Lord, to head the representation. *See id.* ¶ 23. Jaszczuk and Schlessinger spoke with Lewicki, who explained that although the defendants were unable to pay for their own defense, KBP could pay the bill. *See id.* Because this was not permitted by Polish law, however, and because the Polish authorities had been scrutinizing

KBP's expenditures during the ongoing criminal investigation of Lewicki and the Swiechs, Locke Lord would have to conceal on its invoices that its services had been performed for the defendants. *See id.* Lewicki described how the current attorneys had gotten around this problem (*i.e.*, through the billing scheme discussed above), and sent to the Locke Lord attorneys a sample invoice. *See id.* ¶¶ 23–24.

The Locke Lord attorneys agreed with Lewicki that once Locke Lord came on board, it would bill KBP for any services affecting the corporations, billing the defendants separately for only the services performed just for them. *See id.* ¶¶ 28, 30. This way, KBP would pay the majority of each invoice. *See id.* ¶ 28.

Locke Lord eventually prepared two separate engagement letters—one for the KBP entities, and one for the Lewicki/Swiech defendants (although both called for KBP to pay Locke Lord's retainer). *See id.* ¶¶ 29–30. Before the agreements were executed, however, Jaszczuk raised a concern: Domanus and Kozlowski had in previous filings questioned the independence of Janusz Dlugopolski, KBP's attorney in Poland. *See id.* ¶ 32; *see also* Domanus's and Kozlowski's Opposition to the KBP Entities' Motion to Quash, [353] at 14. Jaszczuk worried that Locke Lord's representing both the individual and derivative defendants might also be challenged; but if Locke Lord was not representing both sets of defendants, how could it bill KBP for most of the defense costs? *See* [755] ¶ 32. Jaszczuk called Lewicki and Adam Swiech, who conceded that KBP could not properly pay their defense costs. *See id.* ¶ 33.

The three then agreed on a new approach: Locke Lord would find another law firm to represent the individual defendants, but Locke Lord—now formally representing only the KPB entities—would still defend Lewicki et al.'s interests on the merits (by, for example, litigating the defendants' counterclaim, in the form of a "cross-claim" filed by KBP). *See id.* The defendants' attorney would therefore need to defend the latter for free, agreeing instead to take a larger-than-normal contingency fee for any counterclaims "jointly" prosecuted with counsel at Locke Lord.[6] *See id.* ¶ 35. Jaszczuk recommended Lucas Fuksa, another Polish-speaking attorney in Chicago, for the task. *See id.* ¶ 36.

Fuksa agreed to represent the Lewicki/Swiech defendants for $200 per hour, with a possible contingency fee if the above-mentioned counterclaims were successful. *See id.* ¶ 39. The plan was for Locke Lord to handle the majority of the work related to the "common interest" shared by KBP and the individual defendants. *See id.* Fuksa appeared as counsel for the defendants in September 2011, and Locke Lord sought leave to appear for the KBP entities a month later. *See id.* ¶¶ 40, 44. (In the meantime, Locke Lord had revised its retention agreement with KBP, eliminating any reference to a joint representation. *Id.* ¶ 40.) Domanus and Kozlowski did not formally object to the substitution, but they did file a response to the motion for leave to appear, expressing their concern that the defendants intended to enlist the Locke Lord attorneys in helping with their own

---

[6] General counsel at Locke Lord questioned the propriety of a joint defense, but Jaszczuk concluded that it was permissible because the KBP entities and the individual defendants shared a common legal interest in disproving Domanus's and Kozlowski's allegations. *See* [755] ¶¶ 24, 37.

defense—"perhaps even on the KBP Entities' dime." *Id.* ¶ 44 (quoting Plaintiffs'
Response to Derivative Defendants' Motion for Leave to File Appearance of New
Counsel, [428] at 6). Locke Lord acknowledged that it could not represent both KBP
and its directors, *see* [429] at 4 n. 1, but said it had no intention of representing the
defendants, *see id.* at 3. Locke Lord's motion to appear was granted. [431].

b.    Conduct During the Representation

Once the Locke Lord attorneys were formally on board, Domanus and
Kozlowski forwarded to them various materials collected during the case, including:
bank records for accounts held by the Lewicki/Swiech defendants; reports from a
forensic accountant appointed by the court in Poland; agreements and invoices
prepared by the individual defendants; and Domanus's and Kozlowski's
interrogatory responses, which purported to explain the basis for their claims (as
well as identify documents and other evidence supporting them). *See id.* ¶ 46.
Domanus and Kozlowski also sent Locke Lord a hard drive containing
approximately 60 gigabytes' worth of documents from the Polish prosecutor, which
included, among other things, additional bank records, reports from Polish tax
authorities, the criminal charges brought against Lewicki and the Swiech brothers
in Poland, and interviews with several third parties who had allegedly performed
services for the KBP entities but who were never paid for their work. *See id.* ¶ 47.
Locke Lord did not review the materials on the hard drive. *See id.* ¶ 90.

Plaintiffs claim that, consistent with Locke Lord's alleged agreement to
pursue the interests of the Lewicki/Swiech defendants rather than those of their

actual clients, the Locke Lord attorneys undertook a series of inappropriate actions that harmed the KBP entities, Domanus, or Kozlowski. These actions include: (i) sending a letter to Kozlowski's employer, allegedly in an effort to intimidate Kozlowski into dropping the suit; (ii) opposing the production of certain records during discovery; (iii) obtaining background reports on Kozlowski, Domanus, and Domanus's wife (in order to assist Adam Swiech in his criminal case); (iv) filing a "cross-claim" on KBP's behalf that was really a counterclaim by Lewicki and the Swiech brothers; and (v) opposing a temporary restraining order enjoining Adam Swiech from voting his corporate shares to issue new KBP stock.

**(i) The Letter to Kozlowski's Employer.** In September 2011, the defendants suggested to the Locke Lord attorneys that the attorneys send a letter to Kozlowski's employer—ostensibly on KBP's behalf—requesting production of certain documents relevant to the case. *See id.* ¶¶ 49, 51. Kozlowski was at that time employed as an attorney at the Warsaw office of a law firm based in London. *See id.* ¶¶ 49–50. Schlessinger sent the letter on December 1, asking that the firm produce documents concerning, among other things, a deal between KBP shareholders and one of the firm's clients. *See id.* ¶¶ 50, 52. Schlessinger wrote that he had reason to believe Kozlowski had participated in negotiating that deal on KBP's behalf, and that Kozlowski had also had access to confidential client information because of his connection to the firm. *See id.* ¶ 52.

Neither of these statements, say plaintiffs, was true. As explained in the complaint against the Lewicki/Swiech defendants, and in the documents Domanus

and Kozlowski had given to Locke Lord, the deal was a stock sale between KBP's shareholders and the potential buyer—so KBP itself was not even a party to the proposed transaction. *See id.* ¶ 53. Schlessinger's statements were based solely on what the Lewicki/Swiech defendants had told him. *See id.* According to plaintiffs, the Locke Lord attorneys also had no reason to seek documents from Kozlowski's employer, because KBP had no claims or defenses pending in the litigation. *See id.* ¶ 55.

**(ii) Opposing Document Production.** Domanus and Kozlowski had sought during discovery the production of bank records for accounts held or controlled by the defendants. *See id.* ¶ 59. Defendants failed to produce complete records for all of their accounts, however, and Domanus and Kozlowski were forced to obtain the missing ones by subpoena. *See id.* Not all of them could be obtained in this way, though, because two of the banks were overseas and so were not subject to subpoena power. *See id.* Domanus and Kozlowski again sought production of the still-missing records from the individual defendants. *See id.* ¶ 60.

Jaszczuk opposed production, arguing that the records were irrelevant because the accounts at issue had been opened after the individual plaintiffs filed their third amended complaint. *See id.* But Jaszczuk's opposition was unsuccessful, and the magistrate judge ordered the defendants to turn over the records. *See id.* Plaintiffs claim that what they received showed Lewicki had thousands of dollars from the KBP entities in one of his accounts. *See id.*

Domanus and Kozlowski also sent discovery requests to Locke Lord, requesting information about KBP's contracts with, and payments to and from, the Lewicki/Swiech defendants. *See id.* ¶ 61. Following instructions from one of Dlugopolski's associates in Poland, Locke Lord refused to produce any documents that were not publicly available. *See id.* ¶¶ 63–64. Though Jaszczuk at first told the associate they should produce more documents, the Locke Lord attorneys ultimately agreed to assert the broadly-phrased objections proposed by Dlugopolski's co-worker. *See id.* Locke Lord never reviewed the documents that were withheld. *See id.* ¶ 64.

**(iii) Background Reports on Domanus and Kozlowski.** In September 2011, Jaszczuk met with Lewicki, Richard Swiech, and the defendants' attorney, Lucas Fuksa. *See id.* ¶ 66. During that meeting, Lewicki and Swiech asked Jaszczuk to obtain background reports on Kozlowski, Domanus, and Domanus's wife. *See id.* Jaszczuk obtained from LexisNexis personal and financial information about Kozlowski, etc. *See id.* ¶ 67. He then sent the reports to Lewicki, Swiech, and Fuksa, and to Dlugopolski in Poland. *See id.* ¶¶ 68, 70.

The reports became an issue in plaintiffs' later motion to disqualify the Locke Lord attorneys. In opposing that motion, Locke Lord stated that it had obtained a report and shared it with its client's representative in Poland, but left out that it had gotten the report at defendants' direction (and had sent it to them directly, as well). *See id.* ¶¶ 71–72; Response of the KBP Entities to Plaintiffs' Motion to Disqualify Locke Lord, LLP, [463] at 12.

21

**(iv) The Cross-Claim against Domanus and Kozlowski.** In late 2011, the Locke Lord attorneys began working with the defendants and their counsel (Fuksa) on a "cross-claim" to be filed by the KBP entities against Domanus and Kozlowski. *See id.* ¶ 78. The cross-claim alleged that it was Domanus and Kozlowski who had caused substantial damage to the KBP entities, and Domanus's and Kozlowki's actions that had threatened the companies' profitability. *See id.* ¶ 89; Exhibit A to Motion by the KBP Entities for Leave to File Crossclaim Against Plaintiffs Instanter, [465-1] at 5. Many of the factual allegations in the proposed cross-claim, say plaintiffs, were false. *See* [755] ¶ 90.

The proposed cross-claim was tendered to the district court in connection with Locke Lord's opposition to the motion to disqualify them as counsel for KPB. *See* [463]; [464]; [464-1].[7] In their opposition, Locke Lord stated that it was acting independently for KBP, and that the cross-claim was based on an investigation performed by the Locke Lord attorneys for the KPB entities—which included interviews with persons who had knowledge of the underlying events, such as the Lewicki/Swiech defendants. *See* [463] at 2, 7; *see also* [755] ¶¶ 91–92. In reality, say plaintiffs, the cross-claim was based solely on the defendants' word. *See* [755] ¶¶ 86, 90–91. Locke Lord also discussed with the defendants the possibility of bringing several other motions—including, for example, a motion to dismiss for lack of personal jurisdiction, and a motion for partial summary judgment based on issue preclusion—but ultimately decided not to file them. *See id.* ¶¶ 74–75, 77.

---

[7] Leave to file the cross-claim was denied. *See* [520].

**(v) Opposing the TRO**. In April 2012, Domanus and Kozlowski filed a motion for a temporary restraining order and preliminary injunction, seeking to prevent Adam Swiech from voting his shares to issue new KBP stock. *See id.* ¶ 100. A shareholder meeting had been scheduled for April 16, and the plan was to put to a vote two resolutions: one to issue new shares of stock, and the second to allow a Polish company majority-owned by Adam Swiech's daughter to purchase those shares for $200,000. *See id.* ¶¶ 96, 99.

Plaintiffs claim that there was no need to issue new stock, because there was no need to raise new capital (especially since Adam's daughter's company owed KBP more than $2.8 million in loan money—a loan that KBP, if it did require funds, could have simply called in). *See id.* ¶¶ 102–03. Without reviewing KBP's books and records, Locke Lord opposed the injunction, ostensibly on behalf of the KBP entities, arguing that the requested relief, if granted, would cut off a vital funding source for KBP and so harm the company and its operations. *See id.* ¶¶ 101–02; *see also* Response of the KBP Entities to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, [491] at 6. Locke Lord crafted these arguments in coordination with Lewicki and the Swiech brothers. *See* [755] ¶ 102.

c.     Post-Disqualification Conduct

Domanus and Kozlowski filed a motion to disqualify Locke Lord, which the court granted in May 2012. *See* [455]; [520]. After disqualification, the Locke Lord attorneys continued to communicate with the Lewicki/Swiech defendants and the latter's counsel. Jaszczuk, for example, advised Dlugopolski's office about how the

defendants' alleged co-conspirators could enforce a judgment against Domanus. *See id.* ¶ 111. Following a discussion with Safer and Schlessinger, Jaszczuk also told Fuksa, defendants' counsel in the civil litigation, that Locke Lord would oppose on grounds of privilege any subpoena from Domanus and Kozlowski seeking communications between the Locke Lord attorneys and defendants' attorneys (or defendants themselves). *See id.* ¶¶ 112–13. The Locke Lord attorneys also told Dlugopolski and the defendants that if KBP would pay its outstanding balance to Locke Lord, the latter would consider litigating the cross-claim in a separate suit. *See id.* ¶¶ 111, 115.

In August 2014, plaintiffs filed a supplemental complaint against Locke Lord and Jaszczuk, Safer, and Schlessinger. As with their complaint against Dienner, plaintiffs brought in this complaint a RICO conspiracy claim (alleging violation of 18 U.S.C. § 1962(d)) (Count I), and state-law claims for civil conspiracy (Count IV), legal malpractice (Count VI), breach of fiduciary duty (Count V), aiding and abetting a breach of fiduciary duty (Count III), and aiding and abetting fraud (Count II). *See id.* ¶¶ 145–68. Locke Lord and the three attorney defendants collectively filed a motion to dismiss the claims against them. [761].

## III. Analysis

### A. Locke Lord's Motion

The Locke Lord defendants argue, among other things, that plaintiffs are estopped or otherwise precluded under the *Frow / In re Uranium* doctrine from

bringing certain of their claims, *see* [765] at 44–48, and that plaintiffs have failed to state a proper RICO conspiracy claim, *see id.* at 14–37.

### 1.     *Estoppel and Preclusion*

The Locke Lord defendants first argue that plaintiffs are precluded from bringing certain claims—specifically, their RICO (Count I), civil-conspiracy (Count IV), and aiding-and-abetting claims (Counts II–III)—under a legal doctrine articulated in *Frow v. De La Vega*, 82 U.S. 552 (1872), and *In re Uranium Antitrust Litig.*, 617 F.2d 1248 (7th Cir. 1980).

In *Frow*, the plaintiff claimed that fourteen defendants had joined together in a conspiracy to defraud the plaintiff out of a particular tract of land. *See* 82 U.S. at 552–53. Thirteen of the defendants answered the complaint, but one defaulted, and a final decree of judgment was entered against him—awarding to the plaintiff the title to the disputed land. *See id.* at 553. The case proceeded to trial against the answering defendants, who prevailed on the merits and succeeded in dismissing the complaint against them. *See id.* The Court determined that the entry of the default judgment was impermissible. Where joint liability was asserted, it was illogical to hold one defendant liable and the others not—and so, to avoid such an "absurdity," courts could not enter judgment against defaulting defendants without first resolving the merits as to the others. *See id.* at 554.

The primary concern in *Frow* was the risk of inconsistent determinations of liability. But, as the Seventh Circuit later explained in *In re Uranium*, such inconsistency is not so troubling—and so *Frow* does not apply—where the liability

asserted is not joint, but joint and several. *See* 617 F.2d at 1256–57. The concept of joint liability is based on the idea that someone who joins together with others to commit a tortious act is himself "entirely responsible for the damage resulting from that concerted conduct." *Id.* at 1257. Joint and *several* liability, on the other hand, allows for the possibility that only some of the defendants may be found to have joined the conspiracy at all. *See id.* Thus, in a joint-and-several-liability case, a determination that some of the defendants are liable is not necessarily inconsistent with a determination that other defendants are not. *See id.* It follows that in such cases, unlike in joint-liability cases, default judgment may be entered as to certain defendants before the merits have been adjudicated as to the remaining ones. *See id.* at 1258. What is not permitted, however—even in joint-and-several-liability cases—is entering *damages* against a defaulting defendant before assessing what damages (if any) are owed by the non-defaulters.

The concerns with prematurely entering damages against a defaulter are twofold. The first is, once again, a risk of inconsistency. If damages are entered against a defaulting defendant and the plaintiff later prevails against the answering ones, then damages will need to be proven against the latter, and the second award may differ from the first. *See id.* at 1262. Distinct awards would be unacceptable because liability is not merely several (though it is the "several" component that renders *Frow* inapplicable), but also joint. *See id.* The second concern is one of judicial economy. If, for example, it is determined after entering damages against the defaulters that the plaintiff did not have standing to bring suit

26

in the first place, then the damages hearing was "a useless exercise." *Id.* For these reasons, damages hearings against defaulting defendants in general may not be held until the liability of the non-defaulters has been determined and the entire claim resolved. *See id.*

In the present case, joint and several liability was asserted against the individual (non-KBP) defendants—which included Lewicki (and his wife), the Swiech brothers (and Richard Swiech's wife), and various companies held or controlled by those individuals. *See* [210] at 72–73. Default judgment was entered against only Lewicki and the Swiech brothers. The Locke Lord attorneys argue that because plaintiffs elected to proceed with a damages hearing against the defaulters on what were formerly the "direct" claims (briefing was stayed for damages on the "derivative" claims, *see* [664] at 2, 7; [666]), and obtained a damages award on those claims, plaintiffs cannot now assert those same claims against Locke Lord. *See* [765] at 44–47.[8] The attorneys are correct—in part.

When Domanus and Kozlowski obtained a default judgment against only Lewicki and the Swiech brothers, they left in play the claims against the remaining individual defendants. Entry of the default order itself—*i.e.*, without a final judgment awarding damages on those claims—was proper under *In re Uranium*. *See* 617 F.2d at 1257. But as long as there remained a risk that the non-defaulters could later be held liable, as well, the court could not determine damages as to the

[8] Since the filing of the third amended complaint, the KBP entities have been realigned as plaintiffs in this case. Thus, as a technical matter, all of the claims formerly asserted as "derivative" are now direct claims. For ease of understanding, however, I use "direct" and "derivative" to refer to claims that were previously designated as such.

defaulters. *See id.* at 1262. To avoid this problem, and thus to proceed immediately to a damages determination against the defaulters on the "direct" claims, Domanus and Kozlowski promised—both to the district court and to the court of appeals—to dismiss the claims against the remaining defendants once a final and enforceable judgment had been entered (and, if necessary, affirmed on appeal) against the defaulting ones. *See* [664] at 5; [676] at 3; *Domanus v. Lewicki*, 742 F.3d 290, 304 (7th Cir. 2014). Having made such a promise, Domanus and Kozlowski would be judicially estopped from withdrawing it. *See Domanus*, 742 F.3d at 304.

If Domanus and Kozlowski were permitted to assert against the Locke Lord attorneys the same claims for which they have already obtained an enforceable damages award, that would effectively rescind their earlier commitment. Plaintiffs argue that their earlier promise was to dismiss the direct claims as asserted against particular non-defaulting defendants (which plaintiffs did, *see* [726]; [732])—and the Locke Lord defendants necessarily were not included in that group, because they were not then parties to the case. *See* [776] at 61–62. But plaintiffs' argument takes too narrow a view of what Domanus's and Kozlowski's commitment truly was.

The purpose of Domanus's and Kozlowski's promise was to avoid the problem identified in *In re Uranium*—a problem of potentially inconsistent damages awards. What plaintiffs now argue is, in effect, that Domanus and Kozlowski agreed to dismiss their direct claims only against the *then-named* non-defaulting defendants, thus implicitly reserving the right to replace those particular defendants with other ones at a later time. But such a promise would not have eliminated the risk of

inconsistent damages awards, because any damages assessed against the later-added defendants might differ from those assessed against the defaulters for the same claims. A commitment qualified in the way plaintiffs now argue Domanus's and Kozlowski's promise was qualified is, under *In re Uranium*, no commitment at all.

Domanus and Kozlowki wanted to proceed to a damages determination against Lewicki and the Swiech brothers as soon as possible, and, in order to do so, they promised to dismiss their "direct" claims against all non-defaulting defendants. This promise necessarily included an agreement not to assert the very same claims against other parties at a later date. Plaintiffs are estopped from pursuing against any defendant any "direct" claim for which damages have already been assessed against the Lewicki/Sweich defendants. *See Domanus*, 742 F.3d at 304.[9]

But there may be new "direct" claims for which damages have not yet been determined. Plaintiffs claim that the Lewicki/Swiech defendants have continued over the years to dissipate their assets in an effort to prevent plaintiffs from collecting on any judgment. *See* [755] ¶ 125. To the extent such asset dissipation has harmed Domanus or Kozlowski directly, and has not been included in the damages

---

[9] These claims include the direct claims asserted in the third amended complaint, and the claim for damages arising from the "capital raise" in 2012, *see* [755] ¶ 122. Although the capital raise took place after the third amended complaint was filed, damages from the resulting dilutions in shares were accounted for in the 2013 prove-up. *See* March 1, 2013 Damages Prove-Up Memorandum on Direct Claims, [667] at 7 n. 6; *compare also id.* at 19 (proposing total damages amounts for Domanus and Kozlowski *with* May 31, 2013 Final Judgment on Direct Claims Against Derek Lewicki et al., [698] at 3 (entering judgment in those amounts).

assessment already performed, there is no risk of inconsistent damages awards and these claims may still be viable.

In addition, there are the "derivative" claims. The Locke Lord attorneys argue that plaintiffs are also precluded from asserting against Locke Lord any of what were formerly the derivative claims, because: (1) the Seventh Circuit construed Domanus's and Kozlowski's promise as a promise to dismiss *all* claims pending against the non-defaulting defendants; and (2) such a construction makes sense, because the conduct that allegedly resulted in "direct" injuries is the same conduct that supposedly caused the derivative ones. *See* [765] at 47–48. The attorneys' arguments are unpersuasive.

The court of appeals did describe Domanus's and Kozlowski's promise as a promise "to dismiss all claims against the nondefaulting defendants." 617 F.3d at 304. But the appellate court was discussing a prove-up of only the *direct* claims. Plaintiffs had obtained an order of default on both the direct and derivative claims, but a prove-up was conducted—and final judgment entered—only as to the direct ones. *See* [698] at 5 (entering judgment under Rule 54(b) on Counts I through XIV); [210] at 42–56 (denoting those counts as "direct"). It was the district court's decision not to stay prove-up on the direct claims (as the defaulters had requested) that was under review on appeal. The derivative claims, as the defaulters themselves noted in their appellate brief, were still pending in the district court. *See* [COA-23] at 7–8.[10] Domanus and Kozlowski promised to dismiss all of their direct claims against

---

[10] Citations to the record on appeal are designated by "COA," followed by the document number as reflected on the court of appeal's docket, enclosed in brackets.

the non-defaulters, which they did. *See* Brief of Plaintiffs-Appellees, [COA-31] at 55. Plaintiffs are not estopped from pursuing their derivative claims against the Locke Lord attorneys.

Estoppel aside, the Locke Lord attorneys argue that the principles articulated in *Frow* and *In re Uranium* nonetheless prohibit plaintiffs from moving forward with their derivative claims because there is still a risk of inconsistent results. Since the derivative claims stem from the same transactions as do the direct ones, say the attorneys, it would be logically inconsistent to find that the attorneys are not liable for the derivative claims—a possibility if the plaintiffs fail to prove, for example, that the conduct in which the Lewicki/Swiech defendants engaged amounts to a RICO violation—while continuing to hold the defaulting defendants liable (and ordering them to pay damages) for Domanus's and Kozlowski's direct injuries. *See* [762-1] at 47–48; [793] at 40–41.

*Frow*'s reasoning does not apply here. *Frow* asks whether a default judgment against one defendant would necessarily be logically inconsistent with judgments in favor of other defendants on the same claim. *See Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 812 (7th Cir. 1987) (discussing *In re Uranium*, 617 F.2d at 1257–58). In this case, however, a judgment against Lewicki and the Swiech brothers on the direct claims would not necessarily be in logical conflict with a judgment for the attorneys on the derivative ones. What distinguishes direct from derivative claims is not the nature of the underlying tort, but the type of injury that results: shareholders of a corporation may sue on their own behalf only where they

31

are injured directly; if their injury stems instead from a harm to the corporation, and thus only indirectly from the tort itself, then it is the corporation to whom the claim belongs, and the shareholder may sue, if at all, only in a derivative capacity. *See, e.g.*, *Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 959 (7th Cir. 1996) (discussing shareholder standing in RICO suits); *Flynn v. Merrick*, 881 F.2d 446, 450 (7th Cir. 1989) (same). The attorneys argue here that a finding of no liability on the derivative claims would be logically inconsistent with a default judgment on the direct claims, because the two sets of claims are based on the same transactions. But it is conceivable that these transactions caused one type of injury (direct or derivative) and not the other. *Frow* does not control here.

*In re Uranium* addresses the risk of conflicting damages awards where, as here, the concern in *Frow* does not apply. But the risk of inconsistent damages awards is not an issue for the derivative claims. As just explained, the direct injuries necessarily differ in kind from the derivative ones, and damages have been determined only as to the former. A single damages hearing for the derivative claims as to all liable defendants may be held at the same time, and the Lewicki/Swiech defendants would have an opportunity to seek appropriate relief under Rule 60. *See Marshall*, 819 F.2d at 811–12.

### 2. *The RICO Claim (Count I, Supplemental Complaint)*

Plaintiffs claim that the Lewicki/Swiech defendants were involved in an ongoing conspiracy to loot the KBP companies by: causing the KBP entities to execute sham contracts with the defendants or companies owned or controlled by

them; causing the entities to lease building space at below-market rates (to a Swiech-controlled company); causing the entities to pay increased "construction costs" that in reality were kickbacks to the defendants; and misappropriating from the subsidiaries several tracts of land. Plaintiffs contend that, in developing and executing this scheme, the defendants violated multiple provisions of RICO, including those set forth in Sections 1962(c) and (d) of the statute. *See* [210] ¶¶ 111–16 (alleging violation of 18 U.S.C. § 1962(c)); *id.* ¶¶ 127–31 (alleging violation of 18 U.S.C. § 1962(d)).

Subsection (d) of RICO makes it unlawful to conspire to violate any of the substantive provisions of the statute (subsections (a), (b), or (c)). *See* 18 U.S.C. § 1962(d). Subsection (c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Id.* § 1962(c). To state a claim for relief under § 1962(c), a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern of racketeering activity. *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011) (quoting *United States v. Shamah*, 624 F.3d 449, 454 (7th Cir. 2010)). "Enterprise" is defined by the statute as any individual or legal entity (including any partnership, corporation, or association), or any group of individuals "associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A pattern of racketeering activity is, generally, the commission within a ten-year

33

period of at least two "predicate acts" as enumerated in § 1961(1). *See id.* § 1961(5); *DeGuelle*, 664 F.3d at 199.

In their complaint against the Lewicki/Swiech defendants, Domanus and Kozlowski allege a variety of enterprises—including the KBP entities (each as an individual enterprise), and an association-in-fact enterprise comprising Lewicki, the Swiech brothers, and other defendants to the complaint (*e.g.*, the companies owned or controlled by those defendants)—that Lewicki and the Swiech brothers used to carry out their agreement to loot the businesses. *See* [210] ¶¶ 112–15. (Other members of the conspiracy included Lewicki's wife and Richard Swiech's wife. *See id.* ¶ 129.) Plaintiffs say that the defendants' RICO conspiracy was carried out through a series of predicate acts that included mail and wire fraud (18 U.S.C. §§ 1341, 1343), money laundering (18 U.S.C. § 1956), and violations of the Travel Act (18 U.S.C. § 1952). *See* [210] ¶¶ 78–97.[11]

Plaintiffs now claim that the Locke Lord attorneys joined this same conspiracy. *See* [755] ¶ 9. In their motion to dismiss, the Locke Lord defendants argue not that there was no conspiracy among the Lewicki/Swiech defendants, but that plaintiffs have not adequately alleged that the Locke Lord attorneys joined it.

---

[11] Domanus and Kozlowski do not identify which defendants conducted which enterprise's affairs, or, if there was more than one pattern of racketeering activity (as associated with different enterprises, for example), which predicate acts belong to which pattern. A lack of clarity of this type may be problematic under Rule 8. *See Suburban Buick, Inc. v. Gargo*, No. 08 C 0370, 2009 WL 1543709, at *5 (N.D. Ill. May 29, 2009). But the attorney defendants do not complain of any confusion, so for present purposes, I assume a single pattern of racketeering activity that applies to each of the enterprises named in Domanus's and Kozlowski's third amended complaint.

To state a claim for conspiracy under 18 U.S.C. § 1962(d), a plaintiff must allege: (1) that the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity; and (2) that the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals. *DeGuelle*, 664 F.3d at 204 (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001)). An agreement to participate in the affairs of an enterprise is an agreement to knowingly facilitate the activities of those who are operating the enterprise in an illegal manner. *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 869 (7th Cir. 2001) (quoting *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000)).

At a general level, plaintiffs' theory is that the Locke Lord attorneys knowingly facilitated the racketeering activities of the Lewicki/Swiech defendants by agreeing to: (1) get the Lewicki/Swiech defendants "off the hook" for their alleged misdeeds, thus allowing those individuals both to keep what they had stolen from the KBP entities and to maintain control of the companies (and so continue their looting); and (2) extract payment for Locke Lord's legal services (in reality performed for the defendants) from the KBP entities. *See, e.g.*, [755] ¶¶ 6, 73. But if the attorneys did not know about the defendants' racketeering activities—or know that the defendants were apt to engage in the same activities in the future if given the opportunity—then the attorneys could not have knowingly facilitated those activities. So a threshold question is, what did the attorneys know?

35

According to the supplemental complaint, the Locke Lord attorneys knew about the defendants' racketeering activities from the allegations in the third amended complaint, and from a document authored by a Polish prosecutor stating, among other things, that there was a high probability Adam Swiech had committed the crimes with which he had been charged in Poland. *See* [755] ¶ 21. These allegations fall short of alleging the requisite knowledge.

As for the allegations set forth in the third amended complaint, it may reasonably be assumed that the Locke Lord attorneys at least read them (and also that they saw the document written by the Polish prosecutor, which had been filed on the district court's case docket, *see* [329-1]). But plaintiffs do not allege that the attorneys knew those allegations were true, and nor, without more, would it be reasonable to conclude that the attorneys honestly believed the truth of such allegations. An allegation in a complaint is a statement of what the complainant undertakes to prove with evidence, not evidence itself of that statement's truth.

Similarly, knowing that a prosecutor believes a criminal defendant likely committed the crimes of which he has been accused is not to know that the defendant in fact engaged in the conduct charged. Here again, plaintiffs do not allege that the Locke Lord attorneys believed the prosecutor's statements, and it would be unreasonable to draw such an inference. A prosecutor's expression of beliefs is in this sense no different from a plaintiff's allegations in a civil complaint: both explain what the speaker believes the evidence will show, but nothing about that expression provides opposing counsel with personal knowledge of underlying

36

facts. The essence of most legal proceedings—whether civil or criminal—is a spirited debate about what the evidence demonstrates (or not). That a plaintiff or prosecutor reached a particular conclusion does not reasonably suggest that the defendant's attorney did, as well.[12]

But plaintiffs say that the Locke Lord attorneys had in their possession more than just Domanus's and Kozlowski's allegations and a Polish prosecutor's conclusory statements. Domanus and Kozlowski had sent to the attorneys a large volume of discovery documents—including bank-account records, reports from Polish accountants and tax authorities, and interviews with various witnesses— purportedly showing the defendants' theft from the companies. *See* [755] ¶¶ 46–47. For the attorneys to "know" anything from these materials, however, the attorneys must have at least read them. But, of the documents received, 60 gigabytes' worth came on a hard drive that plaintiffs say the attorneys never reviewed. *See id.* ¶¶ 84, 90. Indeed, plaintiffs claim that the attorneys never conducted a meaningful investigation of the facts in the case, relying instead on what the defendants told them of what had happened. *See* [755] ¶¶ 53–54, 84, 90–91. These allegations suggest that the Locke Lord attorneys did a poor job of getting to the bottom of

---

[12] Plaintiffs allege that along with the Polish prosecutor's statement, also available on the district court's docket was the court's order and opinion denying the Lewicki/Swiech defendants' motions to dismiss. In that opinion, the court stated that the defendants' "fraudulent intent emerges as a compelling inference" from the complaint's many allegations of wrongdoing. See [755] ¶ 21(b) (citing [368] at 11). In considering a motion to dismiss, the district court *must* accept the plaintiffs' well-pleaded factual allegations as true. *See, e.g.*, *Firestone*, 2015 WL 4720281, at *3. The defendant's attorney is under no such obligation.

things, but not that they had knowledge of the racketeering activities described in the third amended complaint.

That said, it would be unreasonable to presume that, during the seven months in which the attorneys formally represented the KBP entities, the attorneys never reviewed *any* of the documents provided to them during discovery. What exactly the attorneys saw, and when they saw it, is a question of fact that cannot be resolved at the motion-to-dismiss stage. For present purposes, I assume (in plaintiffs' favor) that the attorneys reviewed at least a portion of what they received, and that the materials they did review provided evidence to support the claims that the Lewicki/Swiech defendants had stolen from the KBP entities and laundered the pilfered funds. Thus, plaintiffs have pleaded enough to conclude that the attorneys at least suspected some of Domanus's and Kozlowski's allegations might be true. And, depending on what the attorneys did suspect, it is at least conceivable that they also believed the defendants capable of committing similar wrongs in the future.

But mere suspicions of wrongdoing (or of possible future wrongs) do not, without more, amount to knowledge of an ongoing RICO conspiracy. Plaintiffs claim that if the Locke Lord attorneys did not *know* about the defendants' racketeering, it was because the attorneys deliberately closed their eyes to the truth. *See id.* ¶¶ 91, 95; [776] at 41. Guilty knowledge can be inferred from a combination of suspicion and deliberate ignorance. *See United States v. Crabtree*, 979 F.2d 1261, 1269 (7th Cir. 1992); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 131 S.Ct. 2060,

2070–71 (2011) (subjective belief that there is a high probability that a fact is true, coupled with deliberate steps to avoid learning that fact, amounts to knowledge).

Plaintiffs here base their allegations of deliberate ignorance on an e-mail sent by Martin Jaszczuk to fellow Locke Lord attorneys Safer and Schlessinger, *see* [755] ¶ 82.[13] Jaszczuk wrote:

> I've been thinking about how best to address this litigation generally, and doc review and depositions specifically, from our standpoint. The problem, as I now see it, is that this case is just too big for us to ever fully learn given the type of money that KBP wants to spend. Specifically, this matter involves:
>
> (a) not one discrete event, but numerous events spanning about 10 years; (b) perhaps close to 1 million pages to review (most in Polish) (c) thousands, if not tens of thousands, [of] potentially-relevant financial transactions; (d) individuals who are not our clients and who are probably not telling us the full story (perhaps simply because they can't remember intricate details).
>
> Given these issues, I'm beginning to think that learning the entire case is probably not a realistic goal for us, given that it would involve hiring numerous Polish-speaking contract lawyers to go through the documents, expensive forensic accounting, etc. My feeling is that KBP simply wouldn't be able to (or wouldn't want to) pay for this type of undertaking. So, the question is, what do we do, if can't do the Cadillac version here? I think I have the answer.
>
> To begin with, defending against each of the allegations is simply not our role here – that's Luke's [Lucas Fuksa, attorney for the individual defendants to the third amended complaint] job. Second, at this point, I get the feeling that, even if we took the hundreds/thousands of hours necessary to dig down on each allegation/transaction to find the answer, we might very well learn that certain of the allegations are technically true – i.e. that the transactions did occur and that they

---

[13] Only excerpts from Jaszczuk's e-mail are included in plaintiffs' supplemental complaint. *See* [755] ¶ 72. The Locke Lord defendants have attached a copy of the entire e-mail to their motion to dismiss, however. As the e-mail is central to plaintiffs' claims against the Locke Lord attorneys and is referenced in the complaint against them, it may be considered in resolving Locke Lord's motion to dismiss. *See Geinosky*, 675 F.3d at 745 n. 1; *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 735 (7th Cir. 2002).

weren't entirely above board. But, I also get the feeling that we might find that [Domanus and Kozlowski] were well aware of what was going on.

So, instead of undertaking the exhaustive work necessary to dig down and understand every allegation/every detail/every transaction, perhaps KBP might be better served if we generally focused not on disproving what plaintiffs allege, but on proving that plaintiffs knew about these things all along. In other words, we focus on our crossclaim. That would mean directing our discovery and document analysis to (a) facts supporting our crossclaim, and (b) evidence demonstrating [Domanus's and Kozlowski's] knowledge of, and perhaps involvement in, the manner in which this company was being run (this goes to our hostile takeover cause of action).

Obviously, even doing just (a) and (b) will be quite an undertaking, as it will entail our involvement in discovery, doc analysis and depositions. But, it should be far more efficient, realistic (and perhaps effective) than also trying to determine the nature and validity of each of the thousands of underlying financial transactions and transfers. I think we simply let the chips fall where they may as to the numerous transactions. If Clayton/Michaels can prove that they occurred and were illicit, good for them. If they can't, good for Luke. But if we leave all that alone, and instead focus on determining what [Domanus and Kozlowski] knew, when they knew it, and what they did, then plaintiffs' allegations will ring hollow even if Michaels/Clayton can prove them to be true . . . .

If we agree on this approach, I think we'll have a much easier time going through the documents produced (because we'll know exactly what we are looking for), crafting discovery (because we'll know the extent of what we are trying to determine) and preparing and taking depositions (because we'll have specific areas of interest in mind).

I suppose we could summarize this approach as follows: <u>Generally ignore what the defendants did or didn't do – instead focus on what the plaintiffs did and what they knew</u>. This approach should also be consistent with our role as KBP's counsel. I think that, as KBP's counsel, we can safely ignore what the defendants did or didn't do because the Krakow prosecutor and Clayton/Michaels are doing an admirable job of looking into that and don't appear to need our help. But, if this is really a hostile takeover attempt by minority shareholders, then it is our duty . . . to investigate what the plaintiffs knew . . . and what they are trying to accomplish here.

40

[765-1] at 2. Read in context, the e-mail contradicts rather than supports plaintiffs' claim of knowledge through deliberate ignorance.

The e-mail message does suggest that the Locke Lord attorneys chose not to examine all of the discovery materials they had been given (and that Jaszczuk, at least, wondered if the attorneys were getting from the defendants the complete story of what had happened). But the e-mail also explains that the *reason* for not digging deeper was that the attorneys might not be compensated for the looking. *See id.* ("The problem . . . is that this case is just too big for us to ever fully learn given the type of money that KBP wants to spend. . . . [L]earning the entire case is probably not a realistic goal for us . . . ."). Several of Jaszczuk's statements emphasize that it was of no concern at all to Locke Lord if facts supporting Domanus's and Kozlowski's allegations did come to light. *See id.* ("[D]efending against each of the allegations is simply not our role here – that's Luke's job. . . . If [plaintiffs' attorneys] can prove that they occurred and were illicit, good for them. If they can't, good for Luke."). The e-mail also reveals that the lawyers believed the plaintiffs might be right about some things but wrong about others. The lawyers suspected that the plaintiffs knew about the transactions all along, and if the lawyers looked at the materials, they would learn that fact, too.

With this context, the inference of willful blindness that plaintiffs seek to draw—namely, that the lawyers knew about the racketeering—is not a permissible one. What the plaintiffs have actually pleaded is that the lawyers were agnostic and did not subjectively believe that there was a high probability the defendants had

committed the alleged racketeering. The supplemental complaint does not adequately allege the requisite knowledge for the lawyer defendants to be liable for RICO conspiracy.

But even if the lawyers knew about the racketeering, there is another problem with the supplemental complaint: plaintiffs have not alleged an agreement with the defendants to join their RICO conspiracy. If the attorneys' suspicions (and decision not to look at the discovery materials) were enough to infer their knowledge of racketeering activities, and if the attorneys expected the defendants to continue such activities if given the chance, then it could be said that the attorneys knowingly facilitated the racketeering by enabling further theft. This series of inferences, even if plausible, gets plaintiffs only so far. A Section 1962(d) violation requires more than just a knowing facilitation of racketeering activities. It also requires an *agreement* to knowingly facilitate such activities through a pattern of predicate crimes. *See DeGuelle*, 664 F.3d at 204; *Frost*, 241 F.3d at 869. Plaintiffs' allegations against the Locke Lord attorneys fall short on this point, as well.

The attorneys' fraud had two parts. First, say plaintiffs, the attorneys intentionally concealed from others (including their clients and the court) that they were assisting the defendants in the litigation. On more than one occasion, plaintiffs allege, the Locke Lord attorneys falsely professed their independence from the Lewicki/Swiech defendants, or at least neglected to disclose to the court that what they had done was done for defendants' benefit and at their direction. *See, e.g.*,

[755] ¶¶ 71–72; *id.* at 91–92. Second, the attorneys allegedly asserted in the litigation several misstatements of fact on defendants' behalf.

The Locke Lord attorneys ought not to have taken actions on the defendants' behalf or at their behest. In a shareholder's derivative suit, the corporation generally cannot participate in the merits of the defense. *See* 13 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 5997 (database updated 2015); 3 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 15:17 (3d ed., database updated 2014); *Sobba v. Elmen*, 462 F.Supp.2d 944, 946–47 (E.D. Ark. 2006). This general rule, sometimes referred to as the rule of corporate neutrality, reflects the fact that in derivative actions, the plaintiff stockholder is only a nominal plaintiff: the corporation, though named in the complaint as a defendant, is the real party-in-interest, as the benefit of any recovery inures to the company. *See id.*

The true (vice nominal) alignment of the parties in a derivative suit also prevents attorneys from representing certain clients in the litigation. *See, e.g.*, Ill. Rules of Prof'l Conduct R. 1.7 (2010) (prohibiting lawyers from representing in the same legal action clients whose interest are directly adverse). Because, as a practical matter, the corporation's interests in a derivative action are adverse to those of the defendant officers or directors (though, as a technical matter, both appear as "defendants" in the complaint), a single attorney or group of attorneys typically cannot represent both. *See id.* R. 1.13 cmt. 14 (explaining that Rule 1.7 governs who should represent the corporation and the directors in a derivative suit).

To the extent the Locke Lord attorneys formally appeared as counsel for the corporate defendants but secretly took actions on the individual defendants' behalf, their conduct was improper. *See* May 29, 2012 order disqualifying Locke Lord LLP as counsel for the derivative defendants, [520].

The attorneys' role, as plaintiffs correctly point out, was to remain neutral. However, that the attorneys prepared the cross-claim against Domanus and Kozwloski, sought discovery from the latter's employer, or obtained the background reports on those plaintiffs and their wives—and even that they allegedly lied about who they were doing them for—does not plausibly indicate that the attorneys joined the defendants' existing conspiracy.

In general, merely providing legal assistance to defendants in a RICO case is insufficient to show that an attorney has violated Section 1962(d). *See RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051–52 (D.C. Cir. 2012) (affirming the dismissal of a RICO conspiracy claim where the complaint alleged no more than "the provision of normal legal services"); *Handeen v. Lemaire*, 112 F.3d 1339, 1348 (8th Cir. 1997) (observing that "an attorney . . . does not conduct an enterprise's affairs [by providing] run-of-the-mill . . . professional services") (citations omitted); *cf. Taylor v. Bettis*, 976 F.Supp.2d 721, 737 (E.D.N.C. 2013) (holding that attorneys who render legal services to RICO defendants have not violated Section 1962(c) where the legal services did not go "to the heart of" the defendants' racketeering schemes) (citing *Handeen*, 112 F.3d at 1349). Plaintiffs complain that the attorneys here were not supposed to be helping the individual

defendants at all. But this does not change the analysis, because the "betrayal" of Locke Lord's clients, as plaintiffs phrase it, does not in itself suggest that the attorneys agreed to help the defendants through a pattern of racketeering activity— the kind of agreement necessary under Section 1962(d). Just as providing advice to a client does not in itself permit an inference of agreement with that client's activities, neither does providing advice to individuals who the lawyer is not supposed to be advising.

As explained above, one cannot become a member of a RICO conspiracy unless one has agreed to participate in the affairs of an enterprise through a pattern of racketeering activity. But not just any pattern of racketeering activity will do. Where, as here, the plaintiff claims that the defendant joined an *existing* RICO conspiracy, the plaintiff must prove that the defendant agreed to participate in the enterprise's affairs through the same pattern of racketeering to which the already-members of the conspiracy have also agreed. To be part of the same pattern, predicate acts must be related to each other. *See Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). The pattern requirement is a standard, not a rule, so "its determination depends on the facts and circumstances of the particular case." *Id.* (citation omitted). Generally, though, predicate acts are related if they have the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events. *DeGuelle*, 664 F.3d at 199 (quoting *H.J.*, 492 U.S. at 240).

45

The predicate acts to which the Lewicki/Swiech defendants allegedly agreed include mail- and wire-fraud violations, money laundering, and violations of the Travel Act, as effected through: the execution of sham contracts (which caused the KBP entities to pay the defendants, or companies owned or controlled by them, for services never performed, or for land at intentionally-inflated prices); the execution of self-dealing lease agreements (through which the defendants were able to lease from the KBP entities office space at below-market rates, and which space defendants then sub-leased to third parties at market rates); the extraction of kickbacks from building contractors (which KBP paid for through increased construction prices); and misappropriation of land from KBP.

These acts are different in purpose and different in kind than the acts in which the Locke Lord attorneys allegedly engaged by covertly representing the defendants' interests. The defendants' conspiracy was a conspiracy to line the defendants' pockets with the ill-gotten fruits of fraudulent business transactions at the heart of KBP's management and operations. Locke Lord's acts were about securing representation for the defendants—however improper it was to do so—in the pending litigation. The same is true of the billing scheme. Plaintiffs say that the attorneys plotted with the defendants to bill KBP for legal services in fact performed on the defendants' behalf. (This is the conduct also underlying the bulk of the money-laundering claims in the supplemental complaint. *See* [755] ¶¶ 141, 144(a).). But the reason for billing the KBP entities was defendants' inability to pay for their own defense, *see id.* ¶ 23, not a general intent to fatten the defendants'

bank accounts through sham contracts and kickback schemes. The billing scheme, too, was about ensuring that the defendants were represented in the legal suit. These activities were not part of the same pattern as defendants' racketeering activities, and so one cannot infer from them an agreement to join the existing conspiracy.

Plaintiffs emphasize, however, that the attorneys did more than simply take sides in the pending litigation. They also objected (sometimes at the defendants' direction) to the production of various materials sought by Domanus and Kozlowski, and included in several litigation documents defendants' (inaccurate) account of the facts. *See id.* ¶¶ 53–54, 60–64, 90–91, 101–02. Plaintiffs argue that these allegations support an inference that the attorneys intended to conceal relevant evidence from scrutiny, and thus that they joined the defendants' conspiracy. But plaintiffs confuse intent with agreement.

A conspiracy is an agreement to inflict injury or harm, which, even if inferred from circumstantial evidence, requires a meeting of the minds. *See Sow v. Fortville Police Dep't*, 636 F.3d 293, 304–05 (7th Cir. 2011) (citing *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263 (7th Cir. 1999); *see also Amundsen v. Chicago Park District*, 218 F.3d 712, 718 (7th Cir. 2000) ("[I]f the agreement is not overt, the alleged acts must be sufficient to raise the inference of mutual understanding . . . ." (quoting *Kunik v. Racine Cnty., Wis.*, 946 F.2d 1574, 1580–81 (7th Cir. 1991))) (internal quotation marks omitted). The Locke Lord attorneys based their (mis)statements of

fact on the defendants' word, *see* [755] ¶¶ 53–54, 91, 102; [776] at 58[14]—all the while knowing (or so plaintiffs claim) that the defendants were untrustworthy, *see* [755] ¶ 90. These allegations do not support the inference that there was an agreement with the defendants to conceal the truth of their racketeering. An attorney who secretly knows his client is lying but nonetheless includes the client's version of events in court documents has committed a wrong; but the wrong is not in conspiring with the client, because there was no meeting of the minds.

Likewise, Locke Lord's objections to producing documents in discovery do not suggest an agreement to conceal ongoing racketeering. Plaintiffs do not allege that the attorneys actually knew what was in the unproduced records—*i.e.*, that the records evidenced the defendants' looting. To get to knowledge, then, one must go by way of willful blindness. But even assuming that the Locke Lord attorneys had the requisite kind of suspicions about what the unproduced documents contained, there is no indication in the supplemental complaint that those were anything but *secret* suspicions. There are no allegations, in other words, from which to conclude that the attorneys ever spoke about their suspicions with the Lewicki/Swiech defendants, or otherwise communicated a desire to help the defendants continue their racket.

To the extent there was an understanding between the attorneys and the defendants, plaintiffs have alleged only an understanding that the attorneys would

---

[14] In their supplemental complaint, plaintiffs state that the attorneys "made up the statements [in the TRO opposition] in coordination with Lewicki [and] the Swiech brothers." [755] ¶ 102. In their brief responding to Locke Lord's motion to dismiss, however, plaintiffs clarify that the statements in the TRO opposition—like those in the cross-claim (and the discovery letter)—were simply based on the Lewicki/Swiech defendants' word. *See* [776] at 58.

lodge certain objections to document production, and prepare certain papers on the defendants' behalf (while including in those papers the facts as defendants had presented them). Plaintiffs therefore allege coordination, but not the kind that reasonably suggests a meeting of the minds—between the attorneys on the one hand and the defendants on the other—to conceal what had really happened through a shared intent to advance the underlying racketeering. Even at this preliminary stage, where the allegations of the complaints are assumed to be true, plaintiffs have not pleaded an agreement to join the defendants' RICO conspiracy. At most, plaintiffs have pleaded a secret intent on the attorneys' part to enable the defendants' theft.

Plaintiffs rely on *United States v. Cueto*, 151 F.3d 620 (7th Cir. 1998), for the proposition that "intent" and "agreement" are the same. *See* [776] at 19 n. 4 (citing 151 F.3d at 635–36). Intent and agreement are not equivalent, and plaintiffs misread *Cueto* in asserting that they are. The portion of the *Cueto* opinion cited by plaintiffs describes the elements needed to prove (in a criminal case) a conspiracy to defraud under 18 U.S.C. § 371. They are: (1) an agreement to accomplish an illegal objective; (2) one or more overt acts in furtherance of the illegal purpose; and (3) an intent to commit the substantive offense. *See* 151 F.3d at 635 (citation omitted). Although *Cueto* explains that both "intent" and "agreement" may be inferred from circumstantial evidence, *see id.*, *Cueto* does not, as plaintiffs urge, use the two terms interchangeably. They are separate elements of the larger "conspiracy" test. An unlawful intent, in other words, is necessary to prove a conspiracy, but it is not

49

sufficient—one must also show, among other things, an agreement to achieve illegal ends. *Cf. In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1035 (7th Cir. 2002) ("To infer membership [in a conspiracy] from knowledge [of that conspiracy] would erase the distinction between conspiring on the one hand, which means joining an agreement, and aiding and abetting on the other, which means materially assisting a known-to-be-illegal activity in the hope that it will flourish . . . .") (citations omitted); *Familia Rosario v. Holder*, 655 F.3d 739, 744 (7th Cir. 2011) ("[T]here is a distinction between aiding and abetting a conspiracy and participating in a conspiracy, as [the former applies to] those who have knowingly furthered the aims of the conspiracy but who were not members of the conspiracy." (quoting *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994))) (internal quotation marks omitted); *Pereira v. United States*, 347 U.S. 1, 11 (1954) ("Aiding [and] abetting . . . are not terms which presuppose the existence of an agreement.").[15]

Of course, it is sometimes possible—as it was in *Cueto*—to infer *both* intent and agreement from the same evidence. In that case, an attorney was convicted of obstructing justice and conspiracy to obstruct justice after he prepared, with his client, letters and court documents that hindered investigations of the client's illegal gambling operation. *See* 151 F.3d at 624–28. Of critical importance in *Cueto* was the fact that the attorney had developed more than a professional relationship with his client; the two had entered into multiple secret business relationships, the

---

[15] Plaintiffs do not bring an aiding-and-abetting claim under RICO, so I do not address the viability of such a claim.

survival of which depended on the continued success of the very gambling operation that law enforcement was trying to investigate. *See id.* at 627. It was this personal relationship—and, more importantly, the attorney's personal financial stake in the illegal operations—that permitted the jury to find both an intent by the attorney to hamper the federal investigations *and* an agreement (with his client) to do so. *See id.* at 636 (explaining that it was reasonable to conclude from this evidence that the attorney-client representation was "undertaken for a criminal purpose," and that the attorney had "agreed to participate in th[e] scheme for his personal financial gain"). Here, by contrast, there is no allegation from which to infer that if the attorneys had an unlawful intent, they also had an agreement with the defendants to carry it out.

*United States v. Cintolo*, another case on which plaintiffs rely, is also unhelpful. In *Cintolo*, a criminal-defense attorney was convicted of conspiring to obstruct justice. 818 F.2d 980, 983 (1st Cir. 1987). The indictment charged the attorney with conspiring with the alleged head of an illegal gambling ring to obtain information about an ongoing investigation. The lawyer was to get the information by using his position as counsel of record for one of the grand-jury witnesses in the case. He was also tasked with trying to prevent the witness from testifying truthfully before the grand jury. *See id.* at 983–84.

*Cintolo* explains why lawyers who do things attorneys commonly do, but who do them in order to achieve illegal ends, are not immune from liability just because of their status as lawyers. *See id.* at 990–96. This is a sound principle (and the

51

principle cited by the Seventh Circuit in *Cueto* when discussing corrupt intent, *see* 151 F.3d at 631–34), but one that is ultimately irrelevant to the present inquiry. The question at hand is whether the attorneys reached an understanding with the Lewicki/Swiech defendants about putting an improper intent into action in support of a racketeering enterprise. The indications of agreement present in *Cintolo* and *Cueto* are simply not present here.

Plaintiffs are correct that a corrupt intent can get a lawyer into trouble. But nefarious intentions do not in themselves an unlawful agreement make. Even if plaintiffs are right that the Locke Lord attorneys intended to facilitate the defendants' conspiracy, plaintiffs have not sufficiently alleged an agreement to join that conspiracy.[16] For the reasons discussed above, Count I of plaintiffs' supplemental complaint, [755], is therefore dismissed. I do not reach the parties' other arguments concerning Count I of the supplemental complaint.[17]

### 3. The State-Law Claims Against Locke Lord (Counts II-VI)

Because the federal claim against the Locke Lord defendants is dismissed, I decline to exercise supplemental jurisdiction over the state-law claims against those

---

[16] Plaintiffs do not claim that the Locke Lord attorneys formed their own (separate) RICO conspiracy among themselves. *See* Plaintiffs' Memorandum in Opposition to Locke Lord Defendants' Motion to Dismiss Supplemental Complaint, [776] at 35 ("Plaintiffs allege a single, ongoing conspiracy that Locke Lord joined . . . ."). So I do not address whether such a claim has been adequately alleged.

[17] The Locke Lord defendants also argue that the RICO claim should be dismissed, either in whole or in part, because: the claim is barred under the *Noerr-Pennington* doctrine, *see* [765] at 37–40; plaintiffs have not pleaded that the Locke Lord attorneys proximately caused the injuries that allegedly occurred before Locke Lord became involved in the litigation, *see id.* at 40–44; plaintiffs have not pleaded that each of the attorney defendants separately violated RICO (*i.e.*, the supplemental complaint uses an impermissible form of group pleading), *see id.* at 36–37; and plaintiffs do not plead a sufficient domestic anchor for RICO to apply in the first place, *see* [811] at 4–12.

defendants. *See* 28 U.S.C. § 1367(c)(3). Counts II through VI of the supplemental complaint, [755], are also dismissed.

### B.    Dienner and KFTR's Motions

Dienner and KFTR also seek to dismiss the claims against them. Both argue, among other things, that plaintiffs are precluded under *Frow / In re Uranium* from bringing certain claims. *See* [789] at 39 (incorporating Locke Lord's arguments); [792] at 42 (same). Both argue that plaintiffs have also failed to state a proper claim that Dienner joined the defendants' RICO conspiracy. *See* [789] at 22–34; [792] at 28–42.

#### 1.    *Estoppel and Preclusion*

For the reasons discussed above in relation to Locke Lord's motion, plaintiffs are estopped from pursuing against Dienner or KFTR the "direct" claims for which damages have already been determined. These include the direct claims asserted in the third amended complaint, and any claim for damages stemming from the "capital raise" in 2012, *see* [770] ¶ 73. Direct claims based on the defendants' purported asset dissipation may be asserted if damages arising from those claims have not already been assessed. Plaintiffs are neither estopped nor precluded from pursuing against Dienner or KFTR their "derivative" claims.

#### 2.    *The RICO Claim (Count I, Second Supplemental Complaint)*

Plaintiffs claim that Dienner joined the defendants' existing RICO conspiracy (and that KFTR is vicariously liable for Dienner's actions) by: preparing, at the defendants' direction (and at the direction of the defendants' then-counsel at Gordon

& Karr) a motion to quash service on KBP and corresponding reply brief; appealing the district court's denial of that motion; preparing discovery responses in consultation with Gordon & Karr (and agreeing, at Karr's request, to stop trying to collect responsive documents); doctoring invoices so that KBP would pay for the defendants' defense costs; and intentionally misleading others about who Dienner was really representing.

At bottom, plaintiffs charge Dienner (and thus KFTR) with essentially the same wrongs as they do the Locke Lord attorneys. Dienner purportedly took sides in the litigation when he shouldn't have, participated in a billing scheme to get the KBP entities to pay for the individual defendants' defense costs, and conducted discovery according to the defendants' instructions. Dienner argues that he acted consistently with his clients' interests (*i.e.*, with the KBP's interests), and that his billing procedures were appropriate. *See* [789] at 27, 32–34. Plaintiffs' allegations reasonably suggest otherwise. According to plaintiffs, Dienner prepared and filed the motion to quash, as well as responses to interrogatories and document requests, solely at the direction of the Lewicki/Swiech defendants and the latter's counsel—in some cases permitting those individuals to draft things themselves—without first determining whether such actions would actually benefit KBP. *See* [770] ¶¶ 54–58. If this is true, then Dienner, like the Locke Lord attorneys, likely violated the rule of corporate neutrality and perhaps other rules of professional conduct.

Nor were his invoicing procedures necessarily aboveboard, as Dienner claims. The corporations had been paying the defendants' legal bills before Dienner came on

board, so Dienner asserts that he simply continued to forward those bills to the companies. *See* [789] at 27. But Dienner does not explain why the bills he "forwarded" neglected to say for whom their services had been performed, or why Dienner repeatedly agreed, at the defendants' behest, to redact Gordon & Karr's letterhead from those invoices. *See* [770] ¶¶ 30, 35, 44. Plaintiffs' complaint reasonably suggests that something sketchy was going on with the billing, and that Dienner knew it. *See, e.g., id.* ¶¶ 38–39 (alleging that Lewicki sent to Gordon & Karr an e-mail—later forwarded to Dienner—stating that "the [redacted] version . . . will be safe for them. Don't ask why, don't make any comments").

Nevertheless, the complaint against Dienner suffers from much the same defects as does the complaint against the Locke Lord team. As explained above, neither the improper taking of sides in the ongoing litigation (or concealing that Dienner had done so), nor the allegedly fraudulent billing scheme, is in itself related to the Lewicki/Swiech defendants' pattern of racketeering activity as described in the third amended complaint. To the extent Dienner agreed to secretly represent the defendants' interests, or to bill the corporations for services provided to the defendants, he did not agree to participate in the affairs of an enterprise through the same pattern of activity as did the defendants.

There is also no plausible claim of an agreement to join the RICO conspiracy because there are no allegations from which to infer that Dienner actually knew about the defendants' purported wrongs. According to plaintiffs, Dienner "knew" about the defendants racketeering activities because he read the complaint

describing them, and because a statement by the Polish prosecutor (conveying the prosecutor's belief that Adam Swiech had likely committed the crimes with which had been charged in Poland) was available on the court's docket. *See id.* ¶¶ 23, 25, 53. As with the Locke Lord attorneys, there is no allegation that Dienner knew that what he read was true, and nor, without more, would it reasonable to infer that he did. As already discussed, neither the complaint against the defendants nor the prosecutor's expression of his beliefs is a statement that opposing counsel—which is, in effect, what plaintiffs claim Dienner to have been—need accept as accurate. Each is simply an explanation of what the speaker believes the evidence in the case will ultimately demonstrate.

In any event, even assuming that Dienner knew from discovery documents that Domanus's and Kozlowski's allegations of racketeering were true (but unlike with the Locke Lord defendants, plaintiffs do not make such an allegation against Dienner), still plaintiffs have not pleaded the requisite kind of agreement because, here again, there is nothing from which to infer that such knowledge was paired with a meeting of the minds. Absent any indication of a mutual understanding between Dienner and the defendants about what each side knew to be true, one cannot reasonably conclude that Dienner agreed to help the defendants carry on with their racketeering. Plaintiffs have not alleged enough to conclude that there was a conspiracy between Dienner and the defendants (or, more precisely, that Dienner joined the defendants' existing conspiracy). Count I of plaintiffs' second

supplemental complaint, [770], is accordingly dismissed. I do not reach the parties' other arguments concerning Count I of the second supplemental complaint.[18]

### 3.    *The State-Law Claims Against Locke Lord (Counts II-VI)*

As the RICO claim against Dienner and KFTR is dismissed, I decline to exercise supplemental jurisdiction over the state-law claims asserted against those defendants. *See* 28 U.S.C. § 1367(c)(3). Counts II through VI of the second supplemental complaint, [770], are therefore dismissed, as well.

---

[18] Like the Locke Lord defendants, Dienner argues that the RICO claim is barred by the *Noerr-Pennington* doctrine, *see* [789] at 34–39, and that plaintiffs have not adequately alleged causation of plaintiffs' injuries from before Dienner began representing the KBP entities, *see id.* at 20–22. Dienner also argues that all of Domanus's and Kozlowski's claims are actually derivative, not direct, and so cannot be asserted at all by those plaintiffs. *See id.* at 19–20. KFTR separately argues that, even if Dienner is found liable, KFTR cannot be held vicariously liable for Dienner's conduct. *See* [792] at 19–26. KFTR also contends (like the Locke Lord defendants) that RICO does not apply in this case because the conspiracy alleged is not sufficiently domestic. *See id.* at 40–41.

## IV.     Conclusion

The integrity of the justice system depends on the honesty of the officers of the courts, and it is of no small concern when such virtues are abandoned. Plaintiffs certainly provide a detailed claim of wrongdoing by the attorney defendants, and plaintiffs may not be without recourse. But their path to relief based on these allegations is not through RICO, and thus not in federal court. For the reasons discussed above, Locke Lord's, Dienner's, and KFTR's motions to dismiss ([761], [787], and [791], respectively) are granted. Both the supplemental complaint, [755], and second supplemental complaint, [770], are dismissed without prejudice.

ENTER:

Manish S. Shah
United States District Judge

Date: 9/28/15